UNITED STATES DISTRICT COURT
DISTRICT OF KANSAS

| | |
|---|---|
| TP ST ACQUISITION, LLC, a Delaware limited liability company, and TP ST HOLDCO, LLC a Delaware limited liability company,<br><br>                         Plaintiffs,<br><br>   v.<br><br>KEVIN LINDSEY, an individual, and the DVS GROUP, LLC, a Kansas limited liability company,<br><br>                      Defendants. | Case No. 21-CV-2020<br><br><br>**COMPLAINT** |

# COMPLAINT

Plaintiffs, TP ST Acquisition, LLC ("**ScanSTAT Buyer**"), and TP ST Holdco, LLC ("**ScanSTAT Parent**") (ScanSTAT Buyer and ScanSTAT Parent are sometimes collectively referred to as "**ScanSTAT**" or "**Plaintiffs**"), through its undersigned counsel, states and alleges against Defendants, Kevin Lindsey ("**Lindsey**"), and the DVS Group, LLC ("**DVS**") (collectively, "**Defendants**") as follows:

## INTRODUCTION: NATURE OF THE CASE, PARTIES, JURISDICTION, AND VENUE

### *Nature of the Case*

1.    This is an action arising from Defendants' intentional misrepresentations, deceit, and concealment that culminated in their conspiracy to induce ScanSTAT to enter a Membership Interest Purchase Agreement (the "**MIPA**") that caused ScanSTAT Buyer to purchase all of the issued and outstanding membership interests of DataFile Technologies, LLC ("**DataFile**" or the "**Company**").

### *Parties, Jurisdiction and Venue*

2.    Plaintiff ScanSTAT Buyer is a Delaware limited liability company with its principal place of business in Alpharetta, Georgia. The sole member of ScanSTAT Buyer is ScanSTAT Parent, which is a Delaware limited liability company with its principal place of business in Alpharetta, Georgia.

3.    Plaintiff ScanSTAT Parent is a Delaware limited liability company with its principal place of business in Alpharetta, Georgia. The members of ScanSTAT Parent are (a) TP PC Holdco, LLC, a Delaware limited liability company whose members are citizens of Florida and Georgia, (b) Glenn Andrews, an individual, a resident and citizen of Florida, and (c) Akers DFT Holdco, Inc., a corporation which is a citizen of the state of Missouri, with Missouri as its place of incorporation and principal place of business.

4.    Defendant Kevin Lindsey is a resident and citizen of Kansas.

5.       Defendant DVS is a Kansas limited liability company with its principal place of business in Johnson County, Kansas, with the following members: (a) Acquisition Marketing, Inc., a corporation incorporated under the laws of Kansas with its principal place of business in Kansas. (b) Long Odds, LLC, a Kansas limited liability company whose sole member is Ben Olsen, a resident of Kansas, and (c) the Charles W. Schellhorn Revocable Trust dated January 19, 1991, a trust organized and existing under the laws of Kansas.

6.       This Court has original jurisdiction by reason of diversity of citizenship and the requisite amount in controversy, pursuant to 28 U.S.C. §1332(a)(1), in that the suit is between citizens of different states. The amount in controversy in this case, exclusive of interest and costs, substantially exceeds $75,000.

7.       Neither ScanSTAT Buyer nor ScanSTAT Parents nor any of their Members are citizens of the state of Kansas, where Lindsey and DVS are citizens.

8.       Venue and personal jurisdiction is proper in the District of Kansas under 28 U.S.C.A. § 1391(b)(1), (2) and (3) because all defendants are residents of Kansas in which the district is located, a substantial part of the events or omissions giving rise to the claim occurred in this judicial district, and Defendants are otherwise subject to personal jurisdiction in this judicial district.[1]

---

[1] On October 9, 2020, Plaintiffs originally sued Defendants, together with Janine Akers and Akers DFT Holdco in Superior Court in the State of Delaware. Because Defendants, unlike Janine Akers and Akers DFT Holdco were not parties to the

## GENERAL ALLEGATIONS

9.      At all times material, DataFile was in the business of facilitating compliant patient information exchange between healthcare providers and third-party requestors, and providing document management services for healthcare facilities throughout the United States.  ScanSTAT Buyer is in the same business, and the DataFile business was to be combined with ScanSTAT Buyer's business pursuant to the MIPA.

10.      Pursuant to the MIPA, on March 27, 2020, ScanSTAT Buyer purchased all of the issued and outstanding equity interests of DataFile, as further discussed below.

11.      Prior to the closing of the transactions contemplated under the MIPA, Akers DFT Holdco, Inc. ("**Akers Holdco**") was a holder of the majority of membership interests of DataFile, which it sold to ScanSTAT Buyer in those transactions.[2]

---

MIPA, which contained a Delaware venue clause, they filed a Motion to Dismiss for lack of *in personam* jurisdiction and an affidavit in support from Kevin Lindsay, and were voluntarily dismissed by Plaintiffs from the case on that basis. Consequently, Plaintiffs now bring this diversity action against Defendants in the United States District Court for the District of Kansas.

[2] Non-party Berland Family Holdings, Inc. ("**Berland Holdings**") owned a small percentage of the equity interests in DataFile.  Berland Holdings also sold those interests to ScanSTAT Buyer pursuant to the MIPA.

12.     Janine Akers ("**Ms. Akers**" or **"Akers"**) was an integral part of the fraudulent scheme alleged herein, as the controller and owner of all of the issued and outstanding membership interests of Akers Holdco.  Ms. Akers also was the Sellers' representative pursuant to the terms of the MIPA.

13.     ScanSTAT Buyer was the Buyer of the issued and outstanding membership interests of DataFile.  ScanSTAT Holdco is the Parent of ScanSTAT Buyer.

14.     In connection with the discussions and negotiations leading up to the execution of the MIPA, Ms. Akers and Akers Holdco as Sellers were required, and had a duty to ScanSTAT Buyer and ScanSTAT Parent, to make truthful, correct, and full disclosures and representations to ScanSTAT concerning the customers and customer relationships of DataFile.

15.     Lindsey is the Founder and Managing Partner of DVS. Lindsey and DVS were retained to work with Ms. Akers and DataFile as Akers' broker and advisor. In these capacities, Lindsey and DVS advised Ms. Akers and DataFile on their disclosure obligations and facilitated the disclosures that Akers and Akers Holdco were required to make during the deal negotiation and in advance of the closing. In this role, Lindsey and DVS were familiar with the contractual and legal obligations of Ms. Akers and DataFile to provide truthful disclosures. These disclosures included providing material information and disclosures regarding the

customers that Data File had, the value of Data File's customer contracts—including historical information about the income received and anticipated to be received by DataFile from such customers—and that DataFile's customer contracts were valid, binding, in full force and effect, good and in-place existing contracts that were not cancelled, not threatened to be cancelled, or otherwise not adversely affected, and that DataFile had not been notified or advised by any of its customers that any of them intended or desired to terminate or modify their contracts with DataFile, and had not threatened to do so (the "**DataFile Customer Information**").

16.     Lindsey and DVS (a) knowingly and intentionally coordinated and conspired with Ms. Akers and Akers Holdco to hide from ScanSTAT certain material facts and information concerning the customers and customer relationships of DataFile that were material to ScanSTAT's decision to enter the MIPA, and (b) purposefully hid from ScanSTAT the true value of DataFile's customers and business.

17.     The fraudulent and deceitful conduct of Defendants Lindsey and DVS, together with Ms. Akers and Akers Holdco, resulted in ScanSTAT Buyer and ScanSTAT Parent paying transaction consideration to Ms. Akers and Akers Holdco that provided them with: (a) an inflated equity interests purchase price, (b) inflated stock ownership in ScanSTAT Parent, (c) inflated compensation under Ms. Aker's post-closing Employment Agreement, (d) inflated compensation under a post-

closing Consulting Services Agreement, (e) a deferred cash payment of $1,750,000.00 scheduled to be paid at the time of the Company's next liquidity event, and (f) ScanSTAT's assumption of responsibility of approximately $500,000.00 of DataFile's state sales tax liability.

18.    Upon information and belief, the compensation of Lindsey and the DVS Group was based on the value of the transaction.  Thus, the fraudulent and deceitful misrepresentations and omissions that Lindsey and DVS Group made, instructed, encouraged, enabled, and facilitated caused Lindsey and DVS Group to receive inflated compensation to which they were not entitled.

19.    Absent Lindsey and DVS' purposeful, deceitful and fraudulent conduct, ScanSTAT would have been aware or would have become aware of the true and accurate facts surrounding DataFile's decreasing customer base and the downward trajectory of DataFile's business.  Had ScanSTAT known of the facts as they actually were, and not as misrepresented and concealed by Defendants, ScanSTAT would not have closed on the MIPA or would have provided Ms. Akers and Akers Holdco with substantially less and different consideration than that which they were provided in the MIPA and its related agreements, and Lindsey and DVS Group would not have received inflated compensation.

***The MIPA and the Relationship of the Plaintiffs, Defendants, and Co-Conspirators***

20.     DataFile is in the business of facilitating compliant patient information exchange between healthcare providers and third-party requestors, and providing document management services for healthcare facilities throughout the United States.

21.     At all times material, Ms. Akers was the Chief Executive Officer of DataFile.

22.     On March 27, 2020, ScanSTAT Buyer entered into the MIPA whereby ScanSTAT Buyer purchased all of the issued and outstanding membership interests of DataFile.

23.     The total consideration of the transactions represented by the MIPA was $26,500,000.00.

24.     The cash consideration paid at closing as part of the total value of the sale of DataFile's membership interests was $15,750,000.00, of which Ms. Akers and Akers Holdco received $7,810,599.52, in addition to other consideration, including a deferred cash payment of $1,750,000.00, ScanSTAT's assumption of responsibility for approximately $500,000.00 of state sales tax liabilities, 204,819 Membership Interest units in ScanSTAT Parent, representing 17% of the membership interests in ScanSTAT Parent, a Consulting Services Agreement whereby Akers Holdco was to receive a "Services Fee" of $150,000.00 per calendar quarter, or $600,000.00 per year, with an aggregate limit payable to Akers Holdco

of $3,000,000.00, an Employment Agreement whereby Ms. Akers was employed by DataFile in exchange for an annual salary of $200,000.00 per year.

25.     In connection with the closing of the MIPA, Defendant DVS received $660,000.00 for its work and for the work of Defendant Lindsey as financial advisors to Ms. Akers and Akers Holdco.  Upon information and belief, the $660,000.00 cash consideration paid to DVS at closing was falsely and artificially inflated based on the intentionally misleading and fraudulent misrepresentations of the Defendants, and because of their misrepresentations, more specifically alleged below.

**The DataFile Customer Information and Lindsey, DVS, Ms. Akers' and Akers Holdco's Provision of it**

26.     Prior to entering the MIPA, and at all times material thereto, ScanSTAT Buyer and ScanSTAT Parent informed Lindsey and DVS of the importance and materiality of the DataFile Customer Information.

27.     Prior to entering into the MIPA, ScanSTAT informed Lindsey and DVS and Ms. Akers and Akers Holdco, and they knew, that they had a duty and obligation to ScanSTAT to provide ScanSTAT complete, accurate and truthful information regarding the DataFile Customer Information, and to inform and disclose to ScanSTAT whether any of DataFile's customers had notified Ms. Akers or Akers Holdco that any such customer had cancelled, terminated or otherwise materially

altered, or threatened to cancel, terminate, or materially alter their contracts with DataFile, or notified Ms. Akers or Akers Holdco of their intention to do so.

28.     Prior to entering the MIPA, ScanSTAT informed Lindsey and DVS and Ms. Akers and Akers Holdco, and  they knew, that they had a duty to provide ScanSTAT with accurate and truthful DataFile Customer Information so that ScanSTAT could perform proper and appropriate due diligence, evaluation, and valuation of the transactions contemplated by the MIPA, and in connection with ScanSTAT's decision about whether to close the MIPA and provide to Ms. Akers and Akers Holdco the consideration stated in the MIPA on the terms therein.

29.     Prior to entering into the MIPA, Lindsey and DVS and Ms. Akers and Akers Holdco knew that the DataFile Customer Information they provided to ScanSTAT was important and material to ScanSTAT, and that it was required to be complete, accurate, and truthful.

30.     Prior to entering into the MIPA, Lindsey and DVS and Ms. Akers and Akers Holdco knew that ScanSTAT was relying on the DataFile Customer Information they provided.

31.     Lindsey and DVS and Ms. Akers and Akers Holding provided DataFile Customer Information to ScanSTAT on several occasions before the MIPA was executed and closed.  Specifically, a digital "data room" was established so that, among other things, Lindsey and DVS and Ms. Akers and Akers Holdco could

upload the DataFile Consumer Information and enable ScanSTAT to access and review the DataFile Customer Information (the "Data Room").

32.     Lindsey and DVS and Ms. Akers and Akers Holdco uploaded DataFile Customer Information to the Data Room on at least two occasions, in January 2020 and on or about February 25, 2020.   By uploading the DataFile Customer Information to the Data Room, Lindsey and DVS and Ms. Akers and Akers Holdco represented to ScanSTAT that the DataFile Customer Information was accurate, and that it accurately represented the then-current relationships between DataFile and its customers.

33.     Also prior to closing the MIPA, on March 25, 2020, just two days prior to closing, after consultation with Lindsey and DVS, Ms. Akers provided ScanSTAT what she represented to be a list of DataFile's customers "[c]urrent as of today." (the "**Current Customer List**").

34.     At no time after uploading the DataFile Customer Information to the DataRoom or providing the Current Customer List did Lindsey or DVS or Ms. Akers or Akers Holdco state or indicate to ScanSTAT that any of the information uploaded regarding the DataFile Customer Information or the Current Customer List was inaccurate, or that it did not represent the then-current relationships between DataFile and its customers.

35.     Additionally, on several occasions prior to the closing of the MIPA, Lindsey, DVS, Ms. Akers, Akers Holdco, ScanSTAT Buyer and ScanSTAT Parent, among others, had conference calls where ScanSTAT asked Sellers whether the DataFile Customer Information and Current Customer List remained correct, including during a twenty minute conference call at 9:00 am on March 27, 2020, the day the MIPA was closed (the "**Pre-Closing Conference Call**").

36.     Lindsey and DVS also attended the Pre-Closing Conference Call.  A critical purpose of the Pre-Closing Conference Call was to bring current the DataFile Customer Information and the Current Customer List prior to closing.

37.     Sellers together with Lindsey and DVS represented during conference calls, including during the Pre-Closing Conference Call, that the information they previously provided to ScanSTAT was correct.  These representations included information regarding the DataFile Customer Information and Current Customer List previously provided to ScanSTAT.

38.     At no time during these conference calls did Lindsey or DVS or Ms. Akers or Akers Holdco, indicate that any of the DataFile Customer Information or the Current Customer List was inaccurate, or that it did not represent the then-current relationships between DataFile and its customers as known to Lindsey and DVS, Ms. Akers and to Akers Holdco.

39.     Lindsey and DVS and Ms. Akers and Akers Holdco knew that the DataFile Customer Information and the Current Customer List and the accuracy of them was important and material to ScanSTAT in connection with their due diligence, evaluation, and valuation of the contemplated transactions stated in the MIPA, and also in connection with the consideration to be paid to and received by Ms. Akers and Akers Holdco pursuant to the MIPA and its related transactions.

40.     Indeed, the DataFile Customer Information and the Current Customer List and the correctness of them was relied on by ScanSTAT in their evaluation and decision about whether to close the MIPA.

41.     Lindsey and DVS and Ms. Akers and Akers Holdco knew prior to the closing of the MIPA that the DataFile Customer Information and the Current Customer List provided to ScanSTAT was being relied on by ScanSTAT in connection with their evaluation and decision whether to close the transactions contemplated under the MIPA and the consideration to be paid under the MIPA, and in connection with ScanSTAT's due diligence, evaluation, and valuation of the proposed transactions in it.

***Ms. Akers' and Akers Holdco's Fraudulent Disclosures and Material Omissions Regarding the DataFile Customer Information and Defendants' Knowledge and Failures to Disclose***

42.     The DataFile Customer Information and the Current Customer List provided to ScanSTAT by Ms. Akers and Akers Holdco prior to the closing of the

MIPA was materially false, and was known by Lindsey and DVS and Ms. Akers and Akers Holdco to be materially false.

43.     Additionally, Lindsey and DVS and Ms. Akers and Akers Holdco failed to disclose to ScanSTAT material facts and information about the DataFile Customer Information and the Current Customer List that was required to be disclosed by them in order that the DataFile and the Customer Information Current Customer List provided to ScanSTAT were not misleading or false.

44.     Specifically, six customers included in the DataFile Customer Information and the Current Customer List never were disclosed to ScanSTAT as not being existing customers of DataFile, customers that had threatened to cancel their contracts with DataFile, or customers that had materially altered or amended their contracts or relationships with DataFile.  These six customers are: InterMed, Alaska Heart Institute, Whitney M. Young Jr Health Center, Women's Clinic of Johnson County, Cornerstone Family Practice PLC, and Pediatric Surgical.

45.     Of these six customers never disclosed to ScanSTAT as having terminated or impaired contracts, InterMed and Alaska Heart Institute were two of DataFile's largest and most important customers.  Indeed, InterMed was among DataFile's "Top 10" customers, and Alaska Heart was among DataFile's "Top 20" customers.

46.     Further, Ms. Akers, in coordination with Lindsey and DVS, represented to ScanSTAT in her March 25, 2020 Current Customer List that the following ten customers were then-current customers of DataFile with unimpaired contracts: Esse Health, Central Ohio Primary Care Physicians (Canyon Project), Raleigh Medical Group, Michigan Orthopedic Specialists, Western Sierra Medical Clinic, Colorado Mountain, United Community health Center, BCG Medical Group, ARCare (e-filing business), and West Texas Medicine.

47.     Of these ten customers, Central Ohio Primary Care Physicians (Canyon Project) and ARCare were, along with Alaska Heart, also among DataFile's twenty largest and most important customers.

48.     Lindsey and DVS and Ms. Akers and Akers Holdco failed and omitted to inform ScanSTAT prior to execution and closing of the MIPA of the material information that these sixteen customers identified on the DataFile Customer Information and the Current Customer List were either no longer existing customers of DataFile, customers that had threatened to cancel their contracts with DataFile, or customers that had materially altered or amended their contracts or relationships with DataFile.

49.     Collectively, the foregoing sixteen customers[3] are collectively referred to as the "**DataFile Impaired Customers**."

50.     Notably as to InterMed—and as Plaintiffs believe discovery will similarly show as to the other DataFile Impaired Customers—documentary evidence demonstrates that Lindsey and DVS and Ms. Akers and Mr. Lindsey knew of their disclosure requirements but actively, intentionally, and purposefully acted in concert to ignore and disregard them, and to conceal material information from ScanSTAT.

51.     Specifically, on March 20, 2020, InterMed wrote to DataFile requesting that DataFile "discontinue your e-filing work as well as the ROI work until further notice." Notably, Lindsey wrote to Ms. Akers about InterMed that same day, acknowledging that this instruction from InterMed "would **obviously** need to **be disclosed** . . ." (emphasis added).

52.     However, less than four hours later, Mr. Lindsey told Ms. Akers he "changed [his] mind on this as a disclosure."  Ms. Akers agreed with Lindsey and DVS' plan to fraudulently conceal this information from ScanSTAT.

---

[3] InterMed, Alaska Heart Institute, Whitney M. Young Jr Health Center, Women's Clinic of Johnson County, Cornerstone Family Practice PLC, Pediatric Surgical, Esse Health, Central Ohio Primary Care Physicians (Canyon Project), Raleigh Medical Group, Michigan Orthopedic Specialists, Western Sierra Medical Clinic, Colorado Mountain, United Community health Center, BCG Medical Group, ARCare (e-filing business), and West Texas Medicine.

53.     The 2019 net revenues to DataFile for each of the DataFile Impaired Customers totaled $1,829,843.00.  A list of the DataFile Impaired Customers and their respective net sales is attached hereto as **Exhibit A**.

54.     Ms. Akers and Akers Holdco and Lindsey and DVS had a duty to disclose accurate information to ScanSTAT about the DataFile Customer Information and DataFile Impaired Customers through the closing of the MIPA.

55.     Lindsey and DVS and Ms. Akers and Akers Holdco knew that the information included in the DataFile Customer Information and the Current Customer List was material to ScanSTAT, contained false customer information when provided to ScanSTAT or the information became false by the knowing failure to update and correct the information, and was relied on by ScanSTAT to its detriment in connection with its due diligence, evaluation and valuation of the proposed transactions embodied in the MIPA, and ultimately relied on to its detriment in connection with its decision about whether to close on the terms stated in the MIPA.

56.     Lindsey and DVS and Ms. Akers and Akers Holdco failed and omitted to provide ScanSTAT with information correcting their false representations in the DataFile Customer Information and the Current Customer List about the DataFile Impaired Customers, including on the March 27, 2020 Pre-Closing Conference Call.

57.     Lindsey and DVS and Ms. Akers and Akers Holdco knew that ScanSTAT relied on their failure and omission to inform ScanSTAT about the DataFile Impaired Customers, and that the DataFile Impaired Customers had provided DataFile with notice to cancel their contracts or had materially altered them.

58.     The representations by Ms. Akers and Akers Holdco, advised by Lindsey and DVS regarding the DataFile Customer Information, the Current Customer List, and the DataFile Impaired Customers were false, and their omissions and misrepresentations were materially misleading to ScanSTAT.

59.     Lindsey and DVS and Ms. Akers and Akers Holdco knew that ScanSTAT entered the MIPA in reliance on their material misrepresentations and omissions about the DataFile Customer Information, the Current Customer List, and DataFile Impaired Customers.

***Akers and Defendants Fraudulently Re-Trade the Deal***

60.     The failure to properly disclose the DataFile Impaired Customers was part of Defendants' and Akers' overall plan to hide and conceal from ScanSTAT the true nature, value, and downward trajectory of DataFile's business.

61.     By February 2020, ScanSTAT was close to completing its due diligence, and was close to closing the transactions contemplated under the MIPA.

62.     Defendants and Akers intentionally and purposefully sought to cause ScanSTAT to close the transactions under false pretenses, and to lull ScanSTAT into a false sense of security regarding DataFile's business, and the value of its customer base.

63.      Akers and Defendants, in coordination with each other, did this by misrepresenting DataFile's value and the status of its customer relationships.

64.     Akers and Defendants, in coordination with each other, intentionally provided ScanSTAT with an excel spreadsheet containing a false, materially misleading, and inflated representation of DataFile's anticipated 2020 EBITDA.

65.     This spreadsheet was prepared by Lindsey and DVS Group, and presented to ScanSTAT by Ms. Akers with the full knowledge and consent of Lindsey and DVS Group, and with their knowledge of its false and materially misleading and inflated representation of DataFile's anticipated 2020 EBITDA.

66.     Further, Akers and Defendants, in coordination with each other, argued that relative to the economic performance of its acquirer ScanSTAT, DataFile's (fraudulent) anticipated 2020 EBITDA justified an increase in the consideration to Sellers because, Akers and Defendants falsely argued, ScanSTAT's anticipated revenues were not as strong as DataFile's anticipated revenues.

67.     Akers' and Defendants' intentionally false EBITDA calculations caused ScanSTAT to accede to Akers' and Defendants' demands that the (falsified)

EBITDA analysis justified additional and increased closing consideration to Ms. Akers.

68.     Defendants' and Akers' intentional misrepresentation of DataFile's value in the falsified EBITDA presentation resulted in ScanSTAT not only being induced to proceed with the transaction, but also being induced to grant Ms. Akers an additional $1,750,000.00 in deferred compensation.  Upon information and belief, this too, of course, resulted in the fraudulent and inflated increase to the compensation of Defendants Lindsey and DVS Group for acting as Sellers' broker and advisor.

**The Substantial Damages Suffered by ScanSTAT Buyer and ScanSTAT Parent**

69.     ScanSTAT Buyer and ScanSTAT Parent suffered substantial damages as the direct and proximate result of the fraudulent misrepresentations and omissions of Ms. Akers and Akers Holdco advised and facilitated by Lindsey and DVS, and as a proximate result of the conspiracy between Defendants and Ms. Akers and Akers Holdco.

70.     Had Ms. Akers and Akers Holdco not made their misrepresentations and omissions, advised and facilitated by Defendants regarding the DataFile Customer Information, the Current Customer List, the DataFile Impaired Customers, and the false EBITDA calculations, ScanSTAT Buyer and ScanSTAT Parent would not have closed the transactions contemplated by the MIPA, or would have provided

Ms. Akers and Akers Holdco with substantially less and different consideration than that which they were provided in the MIPA and its related agreements.

71.    Specifically, ScanSTAT would not have closed the MIPA, or certainly would not have valued the totality of the transactions embodied in the MIPA at the prices and values that they did, absent the intentionally fraudulent, and conspiratorial actions and conduct of Ms. Akers, Akers Holdco, and the Defendants.

72.    Additionally, and upon information and belief, but for intentionally fraudulent and conspiratorial actions and conduct of Ms. Akers, Akers Holdco and the Defendants, Lindsey and DVS Group would not have received the $660,000.00 commission paid to them from the proceeds of closing.

***The Fraudulent Inducement Facilitated by the Conspiracy of Ms. Akers, Akers Holdco and the Defendants***

73.    Ms. Akers and Akers Holdco committed the tort of fraudulent inducement.

74.    Ms. Akers and Akers Holdco made material misrepresentations about the DataFile Customer Information, the Current Customer List, the DataFile Impaired Customers, and DataFile's EBITDA.

75.    Ms. Akers and Akers Holdco omitted and failed to make material disclosures regarding the DataFile Customer Information, the Current Customer List, the DataFile Impaired Customers, and DataFile's EBITDA that they should have made in order to make the information in the DataFile Customer Information

and the Current Customer List about the DataFile Impaired Customers and as represented by the misleading EBITDA, not misleading or false.

76.    Ms. Akers and Akers Holdco knew of the material falsity of the information they furnished to ScanSTAT, and knew that their omissions regarding the DataFile Customer Information, the Current Customer List, the DataFile Impaired Customers, and the EBITDA were material.

77.    Ms. Akers and Akers Holdco knew that their material misrepresentations were false and the omissions were necessary to be disclosed in order to make the information regarding the DataFile Customer Information, the Current Customer List, and DataFile's EBITDA not materially misleading.

78.    Ms. Akers and Akers Holdco, by their material misrepresentations and omissions intended to and did in fact induce ScanSTAT Buyer and ScanSTAT Parent to enter into the MIPA on the terms set forth in it.

79.    ScanSTAT Buyer and ScanSTAT Parent reasonably and justifiably relied on the material misrepresentations and omissions of Ms. Akers and Akers Holdco in entering into, and valuing the MIPA.

80.    As a direct and proximate result of Akers' and Akers Holdco's misrepresentations and omissions, ScanSTAT Buyer and ScanSTAT Parent have been damaged in an amount in excess of $7,000,000.00.

***The Negligent Misrepresentation Facilitated by the Conspiracy of Ms. Akers, Akers Holdco and the Defendants***

81.    Ms. Akers and Akers Holdco committed the tort of negligent misrepresentation.

82.    Ms. Akers and Akers Holdco made material misrepresentations about the DataFile Customer Information, the Current Customer List, the DataFile Impaired Customers, and DataFile's EBITDA.

83.    Ms. Akers and Akers Holdco omitted and failed to make material disclosures regarding the DataFile Customer Information, the Current Customer List, the DataFile Impaired Customers, and DataFile's EBITDA that they should have made in order to make the information in the DataFile Customer Information, the Current Customer List the DataFile Impaired Customers, and in the DataFile EBITDA not misleading or false.

84.    Ms. Akers and Akers Holdco knew or should have known of the material falsity of the information they furnished to ScanSTAT, and knew or should have known of their material omissions regarding the DataFile Customer Information, the Current Customer List, the DataFile Impaired Customers and in the DataFile EBITDA.

85.    The material misrepresentations by Ms. Akers and Akers Holdco were false and the omissions were necessary to be disclosed in order to make the information regarding the DataFile Customer Information, the Current Customer

List, the DataFile Impaired Customers and in the DataFile EBITDA not materially misleading.

86.     Ms. Akers and Akers Holdco knew or should have known that their misrepresentations and omissions were material, and would induce and did induce ScanSTAT Buyer and ScanSTAT Parent to enter into the MIPA on the terms set forth in it.

87.     ScanSTAT Buyer and ScanSTAT Parent reasonably and justifiably relied on the material misrepresentations and omissions of Ms. Akers and Akers Holdco in entering and valuing the MIPA.

88.     As a direct and proximate result of Akers' and Akers Holdco's misrepresentations and omissions, ScanSTAT Buyer and ScanSTAT Parent have been substantially damaged.

## <u>COUNT I – CONSPIRACY</u>

89.     Plaintiffs adopt and reallege the allegations set forth in Paragraphs 1 through 88 above as if fully set forth herein.

90.     Lindsey and DVS provide "private company dealmaking" services to buyers and sellers of private companies.

91.     Lindsey is the Founder and Managing Partner of DVS.

92.     Lindsey and DVS Group were retained to work and did work with DataFile, Ms. Akers and Akers Holdco in connection with, among other things, the

disclosures that Akers and Akers Holdco were required to make to ScanSTAT in advance of the closing, including the DataFile Customer Information and the DataFile Impaired Customers.

93.     InterMed was a "Top 10" DataFile customer included in the Customer Information.   InterMed instructed DataFile to cease work on its account, but Defendants failed to inform ScanStat of this material fact.

94.     Specifically, prior to closing the MIPA, InterMed wrote an email to DataFile instructing DataFile to "discontinue your e-filing work as well as the ROI work until further notice."

95.     InterMed's email was immediately furnished to Ms. Akers.

96.     Upon receipt of this email, Ms. Akers forward InterMed's email to Lindsey, stating:

> *Here we go….this is $500,000.00 [per] year.*
> *FFFFFFFFFF! This will trigger.  Please advise how to*
> *proceed.*

97.     That day, Lindsey responded by email to Ms. Akers, instructing not to disclose this material fact, stating:

> *Changed my mind on this as a disclosure.*

98.     Additionally, Lindsey and DVS Group intentionally provided false and misleading data about DataFile's EBITDA to ScanSTAT as more fully alleged above.

99.   Ms. Akers and Akers Holdco had a duty to ScanSTAT to inform ScanSTAT of InterMed's instructions to DataFile for DataFile to cease work, and of the true value of DataFile's EBITDA.

100.   Ms. Akers and Akers Holdco breached their duties to ScanSTAT, giving rise to the underlying torts of Fraudulent Inducement and Negligent Misrepresentation, the elements of which are alleged above.

101.   Lindsey and DVS Group knew that Ms. Akers and Akers Holdco had duties to disclose to ScanSTAT the InterMed instructions to DataFile to cease work, the true nature of the DataFile Impaired Customers, and an accurate representation of DataFile's anticipated 2020 EBITDA, and that they did not do so.

102.   InterMed's instructions to cease work, the true nature of the DataFile Impaired Customers, and an accurate representation of DataFile's anticipated 2020 EBITDA were material, and Ms. Akers, Akers Holdco, Lindsey, and DVS Group knew these items were material to ScanSTAT and that Ms. Akers, Akers Holdco, Lindsey, and DVS Group should have disclosed them.

103.   Ms. Akers, Akers Holdco, Lindsey, and DVS Group knew that ScanSTAT was relying on the accuracy of the DataFile Customer Information and an accurate representation of DataFile's anticipated 2020 EBITDA in connection with ScanSTAT's due diligence, evaluation and valuation of the transactions contemplated by the MIPA.

104.   Ms. Akers and Lindsey agreed not to inform ScanSTAT of the material change in InterMed's customer status and of an accurate representation of DataFile's anticipated 2020 EBITDA.

105.   In furtherance of their agreement, Ms. Akers, Akers Holdco, Lindsey, and DVS Group did in fact fail to disclose the material change in InterMed's customer status to ScanSTAT and the accurate representation of DataFile's anticipated 2020 EBITDA.

106.   Additionally, in furtherance of their agreement, Lindsey and DVS knew of, facilitated and enabled Akers' and Akers Holdco's failure to disclose to ScanSTAT material facts and information about the DataFile Customer Information and the Current Customer List.

107.   Specifically, in furtherance of their agreement, Lindsey and DVS knew of, facilitated and enabled Akers' and Akers Holdco's inclusion of six customers in the DataFile Customer Information and the Current Customer List that were never disclosed to ScanSTAT as not being existing customers of DataFile, customers that had threatened to cancel their contracts with DataFile, or customers that had materially altered or amended their contracts or relationships with DataFile. These six customers are InterMed, Alaska Heart Institute, Whitney M. Young Jr Health Center, Women's Clinic of Johnson County, Cornerstone Family Practice PLC, and Pediatric Surgical.

108.   Additionally, in furtherance of their agreement, Lindsey and DVS knew of, facilitated and enabled Akers' and Akers Holdco's misrepresentation to ScanSTAT in her March 25, 2020 Current Customer List that the following ten customers were then-current customers of DataFile with unimpaired contracts: Esse Health, Central Ohio Primary Care Physicians (Canyon Project), Raleigh Medical Group, Michigan Orthopedic Specialists, Western Sierra Medical Clinic, Colorado Mountain, United Community health Center, BCG Medical Group, ARCare (e-filing business), and West Texas Medicine.

109.   As a direct and proximate result of the conduct of Defendants, ScanSTAT Buyer and ScanSTAT Parent have been substantially and materially damaged.

**WHEREFORE**, TP ST Acquisition, LLC and TP ST Holdco, LLC respectfully requests this Court to enter judgment and award damages, in an amount well in excess of $75,000.00, attorneys' fees and costs against the Defendants Kevin Lindsey and the DVS Group, and for such other relief as this Court deems appropriate.

<u>**DEMAND FOR JURY TRIAL**</u>

TP ST Acquisition, LLC and TP ST Holdco, LLC hereby demands trial by jury of all issues so triable.

Respectfully submitted,

FOULSTON SIEFKIN, LLP

*/s/Anthony F. Rupp*
Anthony F. Rupp, #11590
Sarah E. Stula, #27156
32 Corporate Woods, Suite 600
9225 Indian Creek Parkway
Overland Park, KS 66210
(913) 498-2100
(913) 498-2101 FAX
Email: trupp@foulston.com
Email: sstula@foulston.com

**Pending Pro Hac Vice Admission**

Alan Kluger
Steve I. Silverman
David A. Archer
Kluger, Kaplan, Silverman, Katzen &
Levine, P.L.
201 S. Biscayne Boulevard
27th Floor
Miami, FL 33131
(305) 379-9000
(305) 379-3428 FAX
Email: darcher@klugerkaplan.com
Email: ssilverman@klugerkaplan.com
Email: akluger@klugerkaplan.com

**Attorneys for Plaintiffs**