IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

TP ST ACQUISITION, et al.,

        Plaintiffs,

        v.                             Case No. 2:21-CV-02020-JAR-JPO

KEVIN LINDSEY, et al.,

        Defendants.

## MEMORANDUM AND ORDER

Plaintiffs TP ST Acquisition, LLC ("ScanSTAT Buyer") and TP ST Holdco, LLC

("ScanSTAT Parent") (collectively, "Plaintiffs") bring this action against Defendants Kevin

Lindsey ("Lindsey") and the DVS Group, LLC ("DVS") (collectively, "Defendants"), alleging

claims arising from Defendants' role as the sellers' broker in a commercial business transaction

between Plaintiffs and the sellers, non-parties Janine Akers ("Akers") and Akers DFT Holdco,

Inc. ("Akers Holdco").  This matter is now before the Court on Defendants' Motion to Dismiss

Amended Complaint (Doc. 21).  The motion is fully briefed, and the Court is prepared to rule.

For the reasons set forth in detail below, Defendants' motion is granted in part and denied in

part.

I.      **Procedural Background**

Plaintiffs originally filed suit against Lindsey, DVS, Akers, and Akers Holdco in the

Superior Court in the State of Delaware because the purchase agreement between Plaintiffs and

Akers/Akers Holdco contained a Delaware venue clause.  Lindsey and DVS, however, were

not parties to that agreement and sought dismissal for lack of personal jurisdiction, after which

Plaintiffs voluntarily dismissed them from the Delaware action.  Plaintiffs subsequently

brought this action in this Court against Lindsey and DVS.  Akers and Akers Holdco are not parties to this case.

Plaintiffs' original Complaint in this matter contained only one count for civil conspiracy.[1]  On February 5, 2021, Defendants moved to dismiss, in answer to which Plaintiffs filed both an Amended Complaint and a response in opposition.[2]  During a scheduling conference before United States Magistrate Judge James P. O'Hara on April 29, 2021, the parties agreed that Defendants' motion to dismiss Plaintiffs' original Complaint should be denied as moot in light of the filing of an amended complaint, and Judge O'Hara issued an order to that effect.[3]

In their Amended Complaint, Plaintiffs bring seven tort and quasi-contractual claims against Defendants for fraudulent inducement (Count I); negligent misrepresentation (Count II); tortious interference with contract (Count III); tortious interference with an existing or prospective business relationship (Count IV); aiding and abetting fraudulent inducement (Count V); conspiracy (Count VI); and unjust enrichment (Count VII).  Defendants again move to dismiss, arguing that each of Plaintiffs' causes of action fails to state a claim on which relief can be granted.

## II.   Legal Standard

To survive a motion to dismiss brought under Fed. R. Civ. P. 12(b)(6), "the complaint must give the court reason to believe that *this* plaintiff has a reasonable likelihood of mustering factual support for *these* claims."[4]  The plausibility standard does not require a showing of

---

[1] Doc. 1.

[2] Docs. 18, 19.

[3] Doc. 32.

[4] *Ridge at Red Hawk, L.L.C. v. Schneider*, 493 F.3d 1174, 1177 (10th Cir. 2007).

probability that a defendant has acted unlawfully, but requires more than "a sheer possibility."[5] "[M]ere 'labels and conclusions,' and 'a formulaic recitation of the elements of a cause of action' will not suffice; a plaintiff must offer specific factual allegations to support each claim."[6]  Finally, the Court must accept the nonmoving party's factual allegations as true and may not dismiss on the ground that it appears unlikely the allegations can be proven.[7]

The Supreme Court has explained the analysis as a two-step process.  For the purposes of a motion to dismiss, the court "must take all of the factual allegations in the complaint as true, [but] we 'are not bound to accept as true a legal conclusion couched as a factual allegation.'"[8]  Thus, the court must first determine if the allegations are factual and entitled to an assumption of truth, or merely legal conclusions that are not entitled to an assumption of truth.[9]  Second, the court must determine whether the factual allegations, when assumed true, "plausibly give rise to an entitlement to relief."[10]  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."[11]  "While the [Rule] 12(b)(6) standard does not require that Plaintiff establish a prima facie case in [the] complaint, the elements of each alleged cause of action help to determine whether Plaintiff has set forth a plausible claim."[12]

---

[5] *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

[6] *Kan. Penn Gaming, LLC v. Collins*, 656 F.3d 1210, 1214 (10th Cir. 2011) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)).

[7] *Iqbal*, 556 U.S. at 678 (citing *Twombly*, 550 U.S. at 555).

[8] *Id.* (quoting *Twombly*, 550 U.S. at 555).

[9] *Id.* at 678−79.

[10] *Id.* at 679.

[11] *Id.* at 678.

[12] *Khalik v. United Air Lines*, 671 F.3d 1188, 1192 (10th Cir. 2012).

If matters outside the complaint are reviewed, the Court generally must convert a Rule 12(b)(6) motion to a Rule 56 motion for summary judgment.[13]  However, "if a plaintiff does not incorporate by reference or attach a document to its complaint, but the document is referred to in the complaint and is central to the plaintiff's claim, a defendant may submit an indisputably authentic copy to the court to be considered an a motion to dismiss."[14]

## III.    Factual Allegations

Unless stated otherwise, the following facts are drawn from Plaintiffs' Amended Complaint and are assumed true for the purposes of this ruling.

DataFile Technologies, LLC ("DataFile") was in the business of facilitating compliant patient information exchange between healthcare providers and third-party requestors, and it also provided document management services for healthcare facilities throughout the United States.  Akers was the Chief Executive Officer of DataFile and controlled and owned all of the issued and outstanding membership interests of Akers Holdco which, in turn, owned the majority of membership interests in DataFile.  ScanSTAT Buyer was in the same business as DataFile and sought to acquire it.  Akers served as the sellers' representative in connection with discussions and negotiations leading up the purchase.

Lindsey is the Founder and Managing Partner of DVS.  Lindsey and DVS were retained by Akers to work as the sellers' broker and advisor for the sale of DataFile to ScanSTAT Buyer.  Lindsey and DVS advised Akers, Akers Holdco, and DataFile on their disclosure obligations and facilitated the disclosures that they were required to make during the deal negotiation and in advance of closing.  In this role, Lindsey and DVS were familiar with the

---

[13] Fed. R. Civ. P. 12(d).

[14] *GFF Corp. v. Associated Wholesale Grocers,* 130 F.3d 1381, 1384–85 (10th Cir. 1997) (collecting cases).  Both Defendants and Plaintiffs have submitted copies of portions of the contract at issue in this case; neither side disputes the authenticity of the other side's submission.

sellers' contractual and legal obligations to provide truthful disclosures regarding DataFile's customers, the validity, value, and historical performance of its customer contracts, and whether they were aware that any existing contracts might be cancelled or otherwise adversely affected ("DataFile Customer Information").  Further, prior to executing the purchase agreement, Plaintiffs informed Lindsey and DVS of the importance and materiality of the DataFile Customer Information and the obligation to disclose whether any of DataFile's customers had terminated, threatened to terminate, or otherwise materially altered their contracts.  Thus, Akers, Akers Holdco, Lindsey, and DVS knew that Plaintiffs were relying on the DataFile Customer Information they provided.

Akers, Akers Holdco, Lindsey, and DVS provided DataFile Customer Information to Plaintiffs on several occasions before the purchase agreement was executed.  To facilitate the sharing of information, a "Data Room" was created, allowing Akers, Akers Holdco, Lindsey, and DVS to upload—and Plaintiffs to receive—DataFile Customer Information.  Such information was uploaded on at least two occasions, once in January 2020 and once on or about February 25, 2020.  Further, on March 25, 2020, two days prior to the execution of the purchase agreement, Akers, after consulting with Lindsey and DVS, provided Plaintiffs with what she represented was a list of DataFile's current customers as of that date ("Customer List").  At no time did Akers, Akers Holdco, Lindsey, or DVS indicate that any of the information provided was inaccurate or outdated.

However, Akers, Akers Holdco, Lindsey, and DVS knew, but did not disclose, that sixteen customers were no longer DataFile clients, had threatened to cancel their contracts, or had materially altered or amended their contracts.  The 2019 net revenues to DataFile for these sixteen customers totaled $1,829,843.00.  Also, of these sixteen customers, one, InterMed, was

among DataFile's "Top 10" largest and most important customers.  Three of these sixteen clients—Alaska Heart Institute, Central Ohio Primary Care Physicians, and ARCare—were among DataFile's "Top 20" customers.

In the case of InterMed, that company emailed DataFile on March 20, 2020, requesting that DataFile "discontinue [its] e-filing work as well as the ROI work until further notice."[15] The email was immediately provided to Akers, who forwarded it to Lindsey, stating: "Here we go . . . . this is $500,000.00 [per] year.  FFFFFFFFF!  This will trigger.  Please advise how to proceed."[16]  Lindsey responded to Akers the same day, initially advising that the instruction to cease work for InterMed "would obviously need to be disclosed," but then less than four hours later, stating that he had "[c]hanged [his] mind on this as a disclosure."[17]

In addition to the DataFile Customer Information uploaded to the Data Room and the Customer List, Lindsey and DVS prepared, and Akers presented to Plaintiffs, an Excel spreadsheet containing an inflated representation of DataFile's anticipated 2020 earnings before interest, taxes, depreciation, and amortization ("EBITDA").  In negotiations with Plaintiffs, Akers, Lindsey, and DVS argued that relative to ScanSTAT Buyer's economic performance, DataFile's 2020 EBITDA justified an increase in the consideration to be paid to Akers in the deal.  Based on the intentionally false EBITDA spreadsheet, Plaintiffs acceded to their demands and agreed that Akers would receive $1,750,000.00 in deferred compensation in addition to other compensation.

Plaintiffs, Akers, Akers Holdco, Lindsey, DVS, and others had several conference calls during which Plaintiffs asked whether the DataFile Customer Information and Customer List

---

[15] Doc. 18 ¶ 51.

[16] *Id.* ¶ 115.

[17] *Id.* ¶¶ 51−52, 116.

remained correct.  These conference calls included a twenty-minute call beginning at 9:00 am on March 27, 2020, one critical purpose of which was to bring the DataFile Customer Information and Customer List current prior to closing.  During these calls, including the March 27 call, Akers, Akers Holdco, Lindsey, and DVS represented that the information they had previously provided to Plaintiffs was correct.  In deciding whether to execute the agreement and what consideration to pay in order to acquire DataFile, Plaintiffs relied on the accuracy of the DataFile Customer Information, Customer List, and EBITDA spreadsheet. Akers, Akers Holdco, Lindsey, and DVS knew that the information they had provided was false and misleading, and that they had failed to disclose material information to Plaintiffs in order to conceal the downward trajectory of DataFile's business.

On March 27, 2020, ScanSTAT Buyer entered into a Membership Interest Purchase Agreement ("MIPA") whereby it purchased all of the issued and outstanding membership interests of DataFile.  The MIPA contains a provision on "Representations and Warranties of Sellers," which includes the representation that the information provided by Akers and Akers Holdco regarding DataFile's customer relationships is accurate.  The MIPA also includes a "Customers and Suppliers" provision stating:

> Schedule 3.18 sets forth a complete and accurate list of (a) the twenty (20) largest customers of the Company, measured by aggregate billings over a trailing twelve (12) month period as of the fiscal year ended December 31, 2019 . . . .  The Company's relationships with the customers . . . required to be listed on Schedule 3.18 are good commercial working relationships and no such customer . . . has cancelled, terminated or otherwise materially altered  . . . or notified the Company . . . of any intention to do any of the foregoing or otherwise threatened to cancel, terminate, or alter . . . its relationship with the Company.[18]

---

[18] Doc. 25-1 at 2.

The MIPA further includes an integration clause, which reads:

> This Agreement, together with all exhibits and schedules attached to this Agreement, constitutes the entire agreement between and among the Parties pertaining to the subject matter hereof and supersedes all prior agreements, understandings, negotiations and discussions, whether oral or written, of the Parties, and there are no warranties, representations or other agreements between the Parties in connection with the subject matter hereof except as set forth specifically in or contemplated by this Agreement. . . . .[19]

The total consideration involved in the transaction that is the subject of the MIPA is $26,500,000.00, which includes: (1) cash consideration of $15,750,000.00, of which Akers and Akers Holdco received $7,801,599.52; (2) a deferred cash payment to Akers and Akers Holdco of $1,750,000.00; (3) Plaintiffs' assumption of responsibility for approximately $500,000 of DataFile's state sales tax liabilities; (4) 204,891 membership interest units in ScanSTAT Parent, representing 17% of that entity's total membership interest; (5) a Consulting Services Agreement under which Akers Holdco was to receive a "Services Fee" of $150,000.00 per calendar quarter, or $600,000.00 per year, with an aggregate limit payable of $3,000,000.00; and (6) an Employment Agreement whereby Akers was to be employed by DataFile for an annual salary of $200,000.00.  In connection with the closing of the MIPA, DVS received $660,000.00 for its work and Lindsey's work on behalf of Akers and Akers Holdco, an amount that was inflated due to the false and misleading information provided by Akers, Akers Holdco, Lindsey, and DVS during negotiations.

Plaintiffs suffered substantial damages as a result of the coordinated, false, and misleading representations and omissions of Akers, Akers Holdco, Lindsey, and DVS.  Had Akers, Akers Holdco, Lindsey, and DVS not made such representations and omissions

---

[19] Doc. 22-1 at 3−4.

regarding the DataFile Customer Information, Customer List, and projected 2020 EBITDA,

Plaintiffs would not have closed the transaction or would have paid substantially less or

different consideration to acquire DataFile, resulting in no or less commission paid to Lindsey

and DVS.

## IV.    Discussion

### A.    Choice of Law

In a diversity case such as this, the court applies the substantive law of the forum state,

including its choice of law rules.[20]   Kansas courts have consistently applied the doctrine of *lex

loci delicti* to determine choice of law in tort cases.[21]   Under this rule, the law of the state

where the tort occurred controls.[22]   However, "[w]hen a person sustains a loss by

misrepresentation, 'the place of wrong is where the loss is sustained,' not where the

misrepresentations were made."[23]   "The law of the place where the 'effects' of a

misrepresentation were felt controls."[24]   As for a quasi-contractual claim of unjust enrichment,

Kansas looks to the factors enumerated in the Restatement (Second) of Conflict of Law, § 221,

to determine which state's law governs.[25]   These factors, which examine questions such as

---

[20] *Emp'rs Mut. Cas. Co. v. Bartile Roofs, Inc.*, 618 F.3d 1153, 1170 (10th Cir. 2010) (citing *Pepsi-Cola Bottling Co. of Pittsburgh, Inc. v. PepsiCo., Inc.*, 431 F.3d 1241, 1255 (10th Cir. 2005)).

[21] *See Brown v. Kleen Kut Mfg. Co.*, 714 P.2d 942, 944 (Kan. 1986) (citing *McDaniel v. Sinn*, 400 P.2d 1018, 1021 (Kan. 1965)); *Ling v. Jan's Liquors*, 703 P.2d 731, 735 (Kan. 1985) (citations omitted).

[22] *Brown*, 714 P.2d at 944.

[23] *Atchison Casting Corp. v. Dofasco, Inc.*, 889 F. Supp. 1445, 1456 (D. Kan. 1995) (quoting *Raymark Indus., Inc. v. Stemple*, 714 F. Supp. 460, 464 (D. Kan. 1988)).

[24] *Id.* at 1456 (quoting *Seitter v. Schoenfeld*, 678 F. Supp. 831, 836 (D. Kan. 1988)).

[25] *Johnson v. Simonton Bldg. Prods., Inc.*, No. 08-2198-CM-DJW, 2011 WL 251435, at *4 (D. Kan. Jan. 26, 2011) (first citing *Tradesmen Int'l, Inc. v. U.S. Postal Serv.*, 234 F. Supp. 2d 1191, 1204 (D. Kan. 2002); and then citing *Commander Prop. Corp. v. Beech Aircraft Corp.*, 164 F.R.D. 529, 541 (D. Kan. 1995)).

where the parties' relationship was centered and where the benefit was received, "are to be evaluated according to their relative importance with respect to the particular issue."[26]

In this case, Plaintiffs are both Delaware limited liability companies with their principle places of business in Georgia. Defendant DVS is a Kansas limited liability company with its principal place of business in Kansas, and Defendant Lindsey is a Kansas resident. However, the parties rely on Kansas law in their arguments regarding Plaintiffs' claims and do not contend that another state's law should apply, with one exception that is not persuasive for reasons discussed below. "[W]here (as here) a party fails to make 'a clear showing that another state's law should apply,' Kansas choice of law principles require a court to default to Kansas substantive law."[27] Thus, the Court applies Kansas law.

## B.     Fraudulent Inducement (Count I)

Plaintiffs assert that Defendants are liable for fraudulent inducement based on their deceptive actions and omissions during the negotiation of the MIPA. The elements of a claim for fraudulent inducement under Kansas law include:

> (1) The defendant made false representations as a statement of existing and material fact; (2) the defendant knew the representations to be false or made them recklessly without knowledge concerning them; (3) the defendant made the representations intentionally for the purpose of inducing another party to act upon them; (4) the other party reasonably relied and acted upon the representations; [and] (5) the other party sustained damages by relying upon the representations.[28]

---

[26] *Id.* (citing Restatement (Second) of Conflict of Law, § 221 (1971)).

[27] *Howard v. Ferrellgas Partners, L.P.*, 748 F.3d 975, 982 (10th Cir. 2014) (quoting *In re: K.M.H.*, 169 P.3d 1025, 1032 (Kan. 2007)).

[28] *Stechschulte v. Jennings*, 298 P.3d 1083, 1096 (Kan. 2013) (first citing *Chism v. Protective Life Ins. Co.*, 234 P.3d 780, 787 (Kan. 2010); and then citing *Kelly v. VinZant*, 197 P.3d 803, 808 (Kan. 2008); and then citing PIK Civ. 4th 127.40).

In asserting a common-law fraudulent inducement claim, Plaintiff must first clear the hurdle of Rule 9(b) by alleging with adequate particularity "the who, what, where, and when of the alleged fraud."[29]

Defendants argue that Plaintiffs' fraudulent inducement claim fails on the first element because Plaintiffs have not alleged any statement of existing and material fact that Lindsey and/or DVS—as opposed to Akers and/or Akers Holdco—communicated to Plaintiffs.  They argue that Plaintiffs do not allege that any information that Defendants uploaded to the Data Room in January and February 2020 was false when uploaded.  They also point out that Akers, not Lindsey or DVS, provided the Customer List and the EBITDA spreadsheet to Plaintiffs. Defendants contend that Plaintiffs' allegation that during the March 27, 2020 conference call, "Sellers together with Lindsey and DVS represented . . . that the information they previously provided to ScanSTAT was correct," fails to identify anything that Lindsey and/or DVS said that could amount to actionable misrepresentation.  Defendants also argue that because the EBITDA spreadsheet related to anticipated rather than present facts, such representations cannot form the basis for a fraudulent inducement claim under Kansas law.

The Court first rejects Defendants' contention that Plaintiffs have failed to allege any fraudulent statement that Defendants communicated directly to Plaintiffs.  At minimum, Plaintiffs have adequately stated a fraudulent inducement claim based on their allegation that Defendants represented during the March 27, 2020 pre-closing conference call that the information previously provided by Akers, Akers Holdco, Lindsey, and/or DVS remained correct.  This allegation sets forth the who (Lindsey and DVS), what (misrepresentation of the current accuracy of information previously provided by Lindsay, DVS, and their clients),

---

[29] *Jamieson v. Vatterott Educ. Ctr., Inc.*, 473 F. Supp. 2d 1153, 1156 (D. Kan. 2007) (quoting *Plastic Packaging Corp. v. Sun Chem Corp.*, 136 F. Supp. 2d 1201, 1203 (D. Kan. 2001)).

where (conference call), and when (March 27, 2020) of the alleged fraud.  The Court is not persuaded by Defendants' contention that these allegations are insufficient to allege "anything DVS or Lindsey said during the call."[30]  On the contrary, Plaintiffs allege that Defendants knew that DataFile's customer relationships and financial outlook had materially changed, yet falsely represented that they had not.[31]  In addition, although Defendants repeatedly argue that Plaintiffs have failed to identify any information that was false when Defendants uploaded it to the Data Room, Plaintiffs do, in fact, allege that the Datafile Customer Information contained the names of clients who were no longer customers, had threatened to cancel their contracts, or who had materially altered their contracts with DataFile.[32]

Further, Defendants are incorrect that Plaintiffs' fraudulent inducement claim requires a direct communication by Lindsey and/or DVS to Plaintiffs.  Because Kansas has adopted the indirect reliance theory of fraudulent inducement, Plaintiffs may maintain such a claim in the absence of a direct communication based on information prepared by Defendants but provided to Plaintiffs by Akers and/or Akers Holdco.[33]  The Kansas Supreme Court has stated that "liability for misrepresentation is not necessarily limited to the person with whom the misrepresenter deals."[34]  Rather, "[o]ne who makes a fraudulent misrepresentation is subject to liability for pecuniary loss . . . [t]o the persons or class of persons whom he intends or has reason to expect to act or to refrain from act[ing] in reliance upon the misrepresentation."[35]

---

[30] Doc. 22 at 6.

[31] *See* Doc. 18 ¶¶ 42−48.

[32] *Id.* ¶¶ 42−45.

[33] *See Griffith v. Byers Constr. Co. of Kan., Inc.*, 510 P.2d 198, 204 (Kan. 1973).

[34] *Id.*

[35] *Id.* (citing Restatement (Second) of Torts § 531 (Ten. Draft No. 10, 1964)); *see Citizens State Bank v. Gilmore*, 603 P.2d 605, 611−12 (Kan. 1979) (discussing and applying Restatement (Second) of Torts §§ 531, 533); *DeBoer v. Am. Appraisal Assocs., Inc.*, 502 F. Supp. 2d 1160, 1168 (D. Kan. 2007) ("[I]t is clear that under

To prove fraudulent misrepresentation in a case of third-party or indirect reliance, the plaintiff must "establish that (1) they received the information from someone who received it from defendant; (2) defendant intended the information to be conveyed to them[;] and (3) they justifiably relied on the information."[36]  Plaintiff have alleged these elements with respect to materials that Defendants prepared or helped to prepare, but that Akers ultimately provided to Plaintiffs.  These allegations are sufficiently specific as to the who, what, where, and when of the alleged fraud to pass muster under Rule 9(b).[37]  And in any case, the particularly requirement may be relaxed as to allegations regarding which of multiple defendants made a fraudulent statement or committed a fraudulent act under circumstances where "a group of defendants is responsible for a document or statement containing fraudulent misrepresentations."[38]

As to affirmative misrepresentations, the Court also rejects Defendants' argument that the EBITDA spreadsheet they prepared cannot form the basis for a fraud claim because it contained non-actionable statements of *anticipated* facts.  It is true that under Kansas law, "a misrepresentation must relate to a pre-existing or present fact; statements or promises about

---

Kansas law a third party may have an action for fraud without any direct contact with and without having received any direct misrepresentations from the defrauding party." (citing *Citizens State Bank*, 603 P.2d at 610)).

[36] *Hernandez v. Pistotnik*, 472 P.3d 110, 120 (Kan. Ct. App. 2020) (citations omitted).

[37] *See* Doc. 18 ¶¶ 31−32, 42−59 (allegations regarding electronic sharing of DataFile Customer Information through Data Room in January 2020 and on February 25, 2020, and alleged falsity of that information); ¶¶ 51−52, 115−116 (allegations regarding March 20, 2020 decision by Akers and Lindsey to withhold information about DataFile's discontinuation of work for a top client); ¶¶ 33−34 (allegations regarding false and misleading Customer List prepared by Akers and Lindsey and provided to Plaintiffs on March 25, 2020); ¶¶ 35−38 (allegations regarding conference calls, including one on March 27, 2020, during which Akers and Defendants falsely represented the accuracy of information previously provided); ¶¶ 64−65 (allegations regarding Lindsey and DVS's creation of spreadsheet containing false and misleading representation of DataFile's 2020 EBITDA, which Akers then presented to Plaintiffs).

[38] *Bolden v. Culture Farms, Inc.*, No. 85-4297, 1989 WL 160469, at *3 (D. Kan. Nov. 21, 1989) (collecting cases); *see also In re United Telecomms., Inc. Secs. Litig.*, No. 90-2251-O, 1992 WL 176430, at *2 (D. Kan. July 6, 1992) ("This relaxed standard for Rule 9(b) has arisen out of the recognition that it may be exceedingly difficult at the pleading stage to attribute particular fraudulent conduct to each individual defendant." (citing *In re Sahlen & Assocs., Inc., Secs. Litig.*, 773 F. Supp. 342, 362 (S.D. Fla. 1991))).

future occurrences are not actionable."[39]   However, Plaintiffs argue that Defendants' prediction of DataFile's 2020 EBITDA was based on facts about the company's *current* clients and performance and, at the pleading stage, the Court declines to rule that such statements are not actionable.

In addition to relying on affirmative statements, Plaintiffs may attempt to prove fraud by concealment,[40] the elements of which are:

> (1) [T]hat defendant had knowledge of material facts which plaintiff did not have and which plaintiff could not have discovered by the exercise of reasonable diligence; (2) that defendant was under an obligation to communicate the material facts to the plaintiff[;] (3) that defendant intentionally failed to communicate to plaintiff the material facts; (4) that plaintiff justifiably relied on defendant to communicate the material facts to plaintiff; and (5) that plaintiff sustained damages as a result of defendant's failure to communicate the material facts to the plaintiff.[41]

Thus, one "necessary element of fraud by silence is that the defendant was under an obligation to communicate material facts to the plaintiff."[42]   Under Kansas law, courts hold that "a duty to disclose may arise in two situations: (1) when a disparity of bargaining power or of expertise exists between two contracting parties; or (2) the parties are in a fiduciary relationship with one

---

[39] *Flight Concepts Ltd. P'ship v. Boeing Co.*, 38 F.3d 1152, 1157 (10th Cir. 1994) (citing *Edwards v. Phillips Petroleum Co.*, 360 P.2d 23, 26 (Kan. 1961)).

[40] Although Plaintiffs' Count I is entitled "Fraudulent Inducement," and Plaintiffs bring no separate claim for "Fraudulent Concealment," Count I references Defendants' alleged "omissions" six times.  *See* Doc. 18 ¶¶ 75–80.

[41] *Great Plains Christian Radio, Inc. v. Cent. Tower, Inc*., 399 F. Supp. 2d 1185, 1194 (D. Kan. 2005) (quoting *Miller v. Sloan, Listrom, Eisenbarth, Sloan & Glassman*, 978 P.2d 922, 932 (Kan. 1999)).

[42] *Id.* at 1195 (citing *DuShane v. Union Nat'l Bank*, 576 P.2d 674, 678–79 (Kan. 1978)).

another."[43]   In deciding whether a duty to disclose exists, the court must consider the facts and circumstances of each case.[44]

The facts here do not establish that Plaintiffs and Defendants were in a fiduciary relationship with one another.  Nor did Plaintiffs and Defendants have a contractual relationship.  Rather, Lindsey and DVS were the sellers' broker for the transaction at issue and acted primarily for the benefit of Akers and Akers Holdco.  However, "Kansas law . . . imposes a duty on defendants to correct any material misrepresentations, even if no duty exists at the relationship's inception."[45]  Where a plaintiff and defendant are not bargaining with one another, but the defendant gains an advantage by concealing information about a third party and has knowingly or recklessly made a statement that induced the plaintiff to act, a claim for fraudulent concealment may lie.[46]

The Court finds that at the pleading stage, Plaintiffs have adequately alleged facts sufficient to establish a duty to disclose by stating that Defendants either provided (directly or indirectly) inaccurate information to Plaintiffs regarding the DataFile Customer Information, Customer List, and 2020 EBITDA, or learned at some point prior to execution of the MIPA that this information was no longer accurate yet failed to disclose that fact.  Thus, Defendants

---

[43] *N. Ala. Fabricating Co., Inc. v. Bedeschi Mid-West Conveyor Co. LLC*, No. 16-2740-DDC-TJJ, 2018 WL 2198638, at *17 (D. Kan. May 14, 2018) (citing *DuShane*, 576 P.2d at 679).

[44] *See Ensminger v. Terminix Int'l Co.*, 102 F.3d 1571, 1574 (10th Cir. 1996).

[45] *N. Ala. Fabricating Co., Inc.*, 2018 WL 2198638, at *17 (first citing *Great Plains Christian Radio, Inc.*, 399 F. Supp. 2d at 1196; and then citing *Kan. Waste Water, Inc. v. Alliant Techsystems, Inc.*, No. 02-2605-JWL, 2005 WL 1109456, at *18 (D. Kan. May 9, 2005)); *see Sparks v. Guaranty State Bank*, 318 P.2d 1062, 1066 (Kan. 1956).

[46] *See Monarch Normandy Square Partners v. Normandy Square Assocs. Ltd. P'ship*, 817 F. Supp. 899, 907 (citing *DuShane*, 576 P.2d at 679).

owed a "duty of disclosure to the extent disclosure would prevent [their] affirmative representations from being misleading."[47]

Finally, the Court is unpersuaded by Defendants' argument that Plaintiffs cannot assert a fraudulent inducement claim because of the MIPA's integration clause, which they contend reflects the parties' intent to disclaim any liability for misrepresentations outside the MIPA itself and renders any reliance by Plaintiffs on extra-contractual statements unreasonable. In their memorandum in support of their motion to dismiss, Defendants cited no law to support their position, from Kansas or elsewhere. And they concede in their reply brief that under Kansas law, "parol evidence is admissible to show fraud in the inducement of a contract even where the contract contains a provision stating the parties have not relied on any representations other than those contained in the writing."[48] However, for the first time in their reply, Defendants assert that Delaware law determines the effect to be given the integration clause under the terms of the MIPA rather than Kansas law, and that Delaware law requires courts to enforce non-reliance clauses.

The Court first questions whether Defendants' argument for the application of Delaware law is appropriate to raise for the first time in a reply. The court typically does not consider arguments raised for the first time in the reply brief.[49] In any event, Defendants' reliance on the integration clause is misplaced. The integration clause states that "there are no warranties, representations or other agreements *between the Parties* in connection with the

---

[47] *Great Plains Christian Radio, Inc.*, 399 F. Supp. 2d at 1197.

[48] *Miles Excavating, Inc. v. Rutledge Backhoe & Septic Tank Servs., Inc.*, 927 P.2d 517, 518 (Kan. Ct. App. 1996); *see also, e.g., Hilkene v. WD-40 Co.*, No. 04-2253-KHV, 2005 WL 8160831, at *2 (D. Kan. Feb. 10, 2005) ("Even where a written contract expressly disclaims representations outside the contract, a party may rely on parol representations which amount to fraud in the inducement of that contract." (citations omitted)).

[49] *Becker v. Securitas Sec. Servs. USA, Inc.*, No. 06-2226-KHV-DJW, 2007 WL 677711, at *4 & n.17 (D. Kan. Mar. 2, 2007) (collecting cases); *see also Codner v. United States*, 17 F.3d 1331, 1332 n.2 (10th Cir.1994).

subject matter hereof except as set forth specifically in or contemplated by this Agreement."[50]
Defendants are not parties to the MIPA.[51]   Further, although the Court has not been provided
with a copy of the entire contract, it appears that the MIPA incorporates the very same
misrepresentations about DataFile's current customer relationships that Plaintiffs allege
Defendants made during negotiations.[52]   The Court finds this issue inappropriate for resolution
on the briefing before it and at the pleading stage.  Defendants' motion to dismiss is denied as
to Count I.

### C.     Negligent Misrepresentation (Count II)

Kansas "has adopted the tort of negligent misrepresentation as described in the
Restatement (Second) of Torts § 552 (1976)."[53]   The elements of such a claim include:

> (1) The person supplying the false information failed to
> exercise reasonable care or competence in obtaining or
> communicating it; (2) the party receiving the false
> information reasonably relied on it; [] (3) the person relying
> on the false information is a person or one of a group of
> persons for whose benefit and guidance the information is
> supplied or a person or one of a group of persons to whom
> the person supplying the information knew the information
> would be communicated by another; and (4) the party
> receiving the information suffered damages.[54]

---

[50] Doc. 22-1 at 3−4 (emphasis added).

[51] *See, e.g., P.A.L. Env't Safety Corp. v. N. Am. Dismantling Co*., No. 19-11630, 2021 WL 634633, at *4 (E.D. Mich. Feb. 18, 2021) (finding misrepresentation claims against non-party to contract viable where integration clause was limited to the representations of the contracting parties); *Adwalls Media, LLC v. Ad Walls, LLC*, No. 12-00614 SOM/BMK, 2015 WL 419664, at *7 (D. Haw. Jan. 30, 2015) (finding that integration clause did not apply to non-party to contract); *Interwave Tech., Inc. v. Rockwell Automation, Inc*., No. 05-398, 2005 WL 3605272, at *19 (E.D. Pa. Dec. 30, 2005) (same); *Sunquest Info. Sys. Inc. v. Dean Witter Reynolds, Inc*., 40 F. Supp. 2d 644, 656 (W.D. Pa. 1999) (same).

[52] Under "Customers and Suppliers," the MIPA states that "Schedule 3.18 sets forth a complete and accurate list of . . . the twenty (20) largest customers of the Company . . . ."  Doc. 25-1 at 2.

[53] *Rinehart v. Morton Bldgs., Inc.*, 305 P.3d 622, 630 (Kan. 2013) (citing *Mahler v. Keenan Real Estate, Inc*., 876 P.2d 609, 616 (Kan. 1994)).

[54] *Id.* at 630 (citing PIK Civ. 4th 127.43).

"The elements of negligent misrepresentation are similar to those of a claim for fraud, except that a negligent misrepresentation claim does not require proof that the defendant knew the statement was untrue or was reckless as to whether the statement was true or false."[55]  Instead, a negligent misrepresentation claim "merely requires proof that the defendant failed to exercise reasonable care or competence to obtain or communicate true information."[56]  While some courts have held that "[t]o be actionable, a misrepresentation must be an affirmative statement of fact, as opposed to an opinion or omission,"[57] the Kansas Supreme Court has permitted such a claim based on a real estate agent's failure to disclose knowledge in her possession.[58]

Defendants make the same arguments regarding Plaintiffs' negligent misrepresentation claim as with respect to Plaintiffs' fraudulent inducement claim—that Plaintiffs have failed to allege that Defendants supplied any false information to them and that the MIPA's integration clause precludes claims for fraud or misrepresentation.  The Court rejects these arguments for the same reasons set forth above.  Plaintiffs offer specific allegations regarding inaccuracies in the information provided by Defendants to Plaintiffs about present facts, which they contend painted a misleading picture of the health of DataFile's business.  The Court finds that these allegations are sufficient to state a claim for negligent misrepresentation.[59]

---

[55] *Sheldon v. Vermonty*, 31 F. Supp. 2d 1287, 1295 n.8 (D. Kan. 1998) (citing *Mahler*, 876 P.2d at 616); *see also Kreekside Partners v. Nord Bitumi U.S., Inc.*, 963 F. Supp. 959, 966 (D. Kan. 1997) ("[T]he elements of negligent misrepresentation differ from those of fraud only with respect to the standard by which the defendant is charged with knowledge of the representation's falsity." (citation omitted)).

[56] *Gerhardt v. Harris*, 934 P.2d 976, 984 (Kan. 1997) (quoting *Mahler*, 876 P.2d at 616).

[57] *Aldridge v. Aleritas Cap. Corp.*, No. 09-2178-CM-KGS, 2009 WL 2475252, at *7 (D. Kan. Aug. 12, 2009) (citing *Bittel v. Farm Credit Servs. of Cent. Kan.*, 962 P.2d 491, 501 (Kan. 1998)); *see also Sheldon*, 31 F. Supp. 2d at 1295 n.8 (stating that Kansas does not recognize a claim based solely on "negligent omissions" (citation omitted)).

[58] *Stechschulte v. Jennings*, 298 P.3d 1083, 1100 (Kan. 2013) (stating that seller's agent "was not free to ignore what was right before her or to remain silent").

[59] *See supra* n.37.

The Court is also unpersuaded by Defendants' argument that they had "no legal duty to disclose the information at issue."[60]  Regardless of whether Kansas permits a negligent misrepresentation claim premised on omissions, Plaintiffs allege affirmative misrepresentations in addition to omissions.  And since the Kansas Supreme Court's adoption of § 552, liability for negligent representation "extend[s] . . . to professionals who negligently supply information to known or intended recipients of the information," without the requirement of privity.[61]  "The policy favoring liability for innocent misrepresentation is found[ed] on a recognition that purchasers should be entitled to rely on a broker's representations."[62]  "The comments [to § 552] include such examples as negligent audits furnished to relying parties in a financial transaction, negligent engineer reports relied on by contractors bidding for construction work, and negligent land surveys relied on by parties to real estate contracts."[63]  The facts of this case fit within this framework, and Defendants' motion to dismiss is denied as to Count II.

### D.  Tortious Interference with Contract (Count III)

"Kansas has long recognized that a party who, without justification, induces or causes a breach of contract will be answerable for damages caused thereby."[64]  In Kansas, the elements of a claim for tortious interference with contract are "(1) the contract; (2) the wrongdoer's knowledge thereof; (3) his intentional procurement of its breach; (4) the absence of

---

[60] Doc. 22 at 9.

[61] *First State Bank v. Daniel & Assocs., P.C.*, 519 F. Supp. 2d 1157, 1162 (D. Kan. 2007) (citation omitted); *see also Stechschulte*, 298 P.3d at 1099−1100.

[62] *Mahler*, 876 P.2d at 616 (quoting *Bevins v. Ballard*, 655 P.2d 757, 763 (Alaska 1982), *superseded by statute as recognized in Amyot v. Luchini*, 932 P.2d 244, 245−47 (Alaska 1997)).

[63] *Gerhardt v. Harris*, 934 P.2d 976, 984 (Kan. 1997) (citing Restatement (Second) of Torts § 552 cmts. e & h (1976)).

[64] *Dickens v. Snodgrass, Dunlap & Co.*, 872 P.2d 252, 257 (Kan. 1994) (citing *Turner v. Halliburton Co.*, 722 P.2d 1106, 1109, Syl. 7 (Kan. 1986)).

justification; and (5) damages resulting therefrom."[65]  Tortious interference with contract requires malicious conduct by the defendant.[66]

Section 3.18 of the MIPA states that the attached schedule of DataFile's top twenty customers is "complete and accurate," and warrants that DataFile's relationships with these customers are "good commercial working relationships" and that none of these customers have "cancelled, terminated or otherwise materially altered . . . [their] relationship with [DataFile]."[67]  Plaintiffs contend that by contributing to an inaccurate customer list that was incorporated into the MIPA, Defendants procured Akers' and Akers Holdco's immediate breach of the MIPA upon its execution.  However, tortious interference with contract requires an "*existing*, enforceable contract."[68]  Thus, "[a] claim for tortious interference with a contractual relationship requires the existence of a valid and enforceable contract *at the time of the interference* between the plaintiff and a third party."[69]  Here, Plaintiffs' allegations regarding Defendants' conduct relate to events that occurred before the execution of the MIPA. Thus, Plaintiffs' claim for tortious interference with contract fails and is dismissed.

E.    **Tortious Interference with an Existing or Prospective Business Relationship (Count IV)**

Plaintiffs also bring a claim against Defendants for tortious interference with an existing or prospective business relationship.  Such a claim requires:

---

[65] *Diederich v. Yarnevich*, 196 P.3d 411, 418 (Kan. Ct. App. 2008) (quoting *Burcham v. Unison Bancorp., Inc.* 77 P.3d 130, 150 (Kan. 2003)); *see also Bushnell Corp. v. ITT Corp.*, 973 F. Supp. 1276, 1288 (D. Kan. 1997) (citation omitted).

[66] *Burcham*, 77 P.3d at 151 (quoting *Turner*, 722 P.2d at 1115).

[67] Doc. 25-1 at 2.

[68] *Burcham*, 77 P.3d at 151 (emphasis added); *see also Cohen v. Battaglia*, 293 P.3d 752, 755 (Kan. 2013) (stating that the tort of tortious interference with contract "is aimed at preserving *existing* contracts" (emphasis added) (citing *Turner,* 722 P.2d at 1115)).

[69] *Macke Laundry Serv. Ltd. P'ship v. Mission Assocs., Ltd.*, 873 P.2d 219, 225 (Kan. Ct. App. 1994) (emphasis added) (first citing Prosser & Keeton, Law of Torts § 129, p. 994 (5th ed. 1984); and then citing *Noller v. Gen. Motors Corp.*, 772 P.2d 271, 276 (Kan. 1989)).

> (1) [T]he existence of a business relationship or expectancy with the probability of future economic benefit to the plaintiff; (2) knowledge of the relationship or expectancy by the defendant; (3) a reasonable certainty that, except for the conduct of the defendant, plaintiff would have continued the relationship or realized the expectancy; (4) intentional misconduct by defendant; and (5) incurrence of damages by plaintiff as a direct or proximate result of defendant's misconduct.[70]

Like tortious interference with contract, tortious interference with a business relationship is "predicated on malicious conduct by the defendant."[71]

Defendants contend that this claim fails for three reasons. First, they argue that because Plaintiffs have not alleged that Defendants provided any false information directly to Plaintiffs, they have failed to allege intentional misconduct. Second, they contend that Plaintiffs have failed to allege facts giving rise to an inference of malice. Third, they argue that no business relationship or expectancy could have arisen between Plaintiffs and Akers/Akers Holdco until after the execution of the MIPA on March 27, 2020.

The Court quickly disposes of Defendants' first and third arguments. As set forth above, Plaintiffs have adequately alleged that Defendants intentionally misrepresented, both through their own statements and through materials they prepared for Akers to share with Plaintiffs, the health of DataFile's business. And Defendants' argument that no prospective relationship between Plaintiffs and Akers/Akers Holdco could have existed until after the contract for the sale of DataFile was executed ignores the plain meaning of the word "prospective." The tort of tortious interference with a prospective business relationship "is aimed at . . . protecting *future or potential* contractual relations."[72]

---

[70] *Greer v. City of Wichita*, No. 16-1185-EFM-JPO, 2017 WL 1492937, at *6 (D. Kan. Apr. 26, 2017) (citing *Cohen*, 293 P.3d at 755).

[71] *Burcham*, 77 P.3d at 151 (citation omitted).

[72] *Cohen*, 293 P.3d at 755 (emphasis added) (citing *Turner*, 722 P.2d at 1115)); *see also Ayres v. AG Processing Inc.*, 345 F. Supp. 2d 1200, 1210 (D. Kan. 2004).

As to Defendants' argument that Plaintiffs have failed to allege the requisite intent of malice, the Court disagrees and finds that Plaintiffs have adequately alleged that Defendants "intentionally acted to do a harmful act without reasonable justification or excuse" at the pleading stage.[73]  In Count IV, Plaintiffs allege that Defendants acted intentionally when they provided false and incomplete information relating to DataFile's customers, and when they later reassured Plaintiffs that this information remained accurate.  Elsewhere, Plaintiffs' Complaint contains specific facts to support that Defendants knew that at least one key client had asked DataFile to cease work, but that Lindsey directed Akers not to disclose that information prior to the execution of the MIPA.

Defendants argue that "Count 4 leaves open the possibility that DVS and Lindsey acted in their 'own self-interest without the intent to harm, and thus fails to plead sufficient factual content that would allow the court to draw the reasonable inference' [that] they acted maliciously."[74]  It is true that "there may be justification or a qualified privilege in an action for tortious interference with a business prospect.  In terms of the Restatement [(Second) of Torts, § 767], if the actions complained of were not improper there is no ground for recovery."[75]  The following factors determine whether an actor's intentional interference with a prospective contractual relation of another is improper:

> (a) the nature of the actor's conduct,
>
> (b) the actor's motive,

---

[73] *Ronald  L. Jones Charitable Tr. v. Sanders*, Nos. 106,690, 106,691, 2012 WL 3966557, at *9 (Kan. Ct. App. Sept. 7, 2012) (first citing *Linden Place, LLC v. Stanley Bank*, 167 P.3d 374, 380 (Kan. 2007); and then citing PIK Civ. 4th 103.05); *see also Goldman v. Univ. of Kan.*, No. 122,060, 2020 WL 7635985, at *11 (Kan. Ct. App. Dec. 23, 2020) ("Malice is 'a state of mind characterized by an intent to do a harmful act without a reasonable justification of excuse.'") (citations omitted).

[74] Doc. 22 at 12−13 (quoting *Matrai v. AM Entertainment, LLC*, No. 14-2022, 2015 WL 1646214, at *8 (D. Kan. Apr. 14, 2015).

[75] *Turner*, 722 P.2d at 1117.

(c)  the interests of the other with which the actor's conduct
     interferes,

(d)  the interests sought to be advanced by the actor,

(e)  the social interests in protecting the freedom of action of the
     actor and the contractual interests of the other,

(f)  the proximity or remoteness of the actor's conduct to the
     interference, and

(g)  the relations between the parties.[76]

"The term 'justification' has been said not to be susceptible of any precise definition."[77]

Critically here, "[i]t is employed to denote the presence of exceptional circumstances which

show that no tort has been in fact committed and to connote lawful excuse which excludes

actual or legal malice."[78]

Defendants argue that Plaintiffs' claim for tortious interference with a prospective

business relationship does not fit the facts of this case, because by interfering with Plaintiffs'

prospective relationship with Akers/Akers Holdco, Defendants could have harmed their own

interest in receiving a commission.  On the other hand, however, Plaintiffs contend that

Defendants interfered in order to harm Plaintiffs' future business prospects while increasing

Defendants' own compensation as the sellers' broker.  The Court finds that Plaintiffs have

adequately alleged the elements of this claim, including facts showing that Defendants' acts

were intentional and improper.  Further, "[t]he issues of defendants' motive and the presence

---

[76] *Id.* at 1116−17 (citing Restatement (Second) of Torts, § 767 (1979)); *see also Burcham v. Unison Bancorp., Inc.* 77 P.3d 130, 152 (Kan. 2003) (quoting *Reebles, Inc. v. Bank of Am., N.A.*, 25 P.3d 871, 876 (Kan. Ct. App. 2001)).

[77] *Burcham*, 77 P.3d at 152 (quoting *Turner*, 722 P.2d at 1116).

[78] *Id.* (quoting *Turner*, 722 P.2d at 1116).

or absence of malice are typically questions for the jury."[79]  On the allegations and arguments before it, the Court will not dismiss Count IV at the pleading stage.

### F.    Aiding and Abetting Fraudulent Inducement (Count V)

Plaintiffs also bring a claim against Defendants for aiding and abetting Akers and Akers Holdco in fraudulently inducing Plaintiffs to enter into the MIPA.  The elements of a claim for aiding and abetting include:

> (1) [T]he party whom the defendant aids must perform a wrongful act that causes an injury; and (2) the defendant must be generally aware of his role as part of an overall illegal or tortious activity at the time that he provides the assistance; [and] (3) the defendant must knowingly and substantially assist the principal violation.[80]

Defendants contend that Plaintiffs' claim fails on the first and third elements.

As to the first element, Plaintiffs again argue that the MIPA's integration clause precludes liability for any pre-closing statements by Akers or Akers Holdco.  In so arguing, Defendants imply that Akers and/or Akers Holdco (the parties they are alleged to have aided) could not have performed a "wrongful act."  The Court rejects this argument in part because Plaintiffs have not been afforded the opportunity to address Defendants' argument—raised for the first time in their reply brief—that Delaware law governs the effect of the MIPA on Plaintiffs' claims in this case.

Further, the primary case relied upon by Defendants regarding the effect of the integration clause under Delaware law, *Abry Partners V, L.P. v. F & W Acquisition LLC*, does

---

[79] *M W., Inc. v. Oak Park Mall, L.L.C.*, 234 P.3d 833, 848 (Kan. Ct. App. 2010) (quoting *Burcham,* 77 P.3d at 152); *see also Furr v. Ridgewood Surgery & Endoscopy Ctr., LLC*, No. 14-1011-KHV, 2016 WL 3633327, at *12 (D. Kan. June 29, 2016) (citation omitted).

[80] *State ex rel. Mays v. Ridenhour*, 811 P.2d 1220, 1232 (Kan. 1991) (quoting *Halberstam v. Welch*, 705 F.2d 472, 477 (D.C. Cir. 1983)); *see also York v. InTrust Bank, N.A.*, 962 P.2d 405, 425 (Kan. 1998); *Sprague v. Peoples State Bank*, 844 F. Supp. 662, 672 (D. Kan. 1994).

not help their position.[81]  That case discusses at length the extent to which a contract can insulate a party from liability for fraud in the inducement when *the contract itself* contains false statements, as is alleged to be the case here.[82]  The court in *Abry* noted that while sensitive to the need to honor contracts between parties of equal bargaining strength, "Delaware courts have shared [a] distaste for immunizing fraud," and that "courts have generally refused to . . . allow a contractual waiver of the buyer's right to sue on the basis that a contractually-represented fact was false as a result of the seller's reckless or intentional conduct.  Abundant case law to this effect exists."[83]  Plaintiffs' Amended Complaint contains sufficient allegations of fraudulent and misleading acts by Akers and Akers Holdco to support Plaintiffs' aiding and abetting claim against Defendants in this case.

As to the third element of an aiding and abetting claim, in determining whether the defendant provided "substantial aid," Kansas courts consider "the nature of the tortious act, the amount and kind of assistance given, whether the defendant was present at the time of the tort, the relationship between the defendant and the tortious actor, the defendant's state of mind, and the duration of the assistance the defendant provided."[84]  Defendants argue that "[P]laintiffs do not allege sufficient facts for the Court to infer knowing and substantial assistance by DVS or Lindsey."[85]  The Court finds that contrary to Defendants' argument, Plaintiffs have alleged facts sufficient to show Defendants' knowing and substantial assistance in fraudulent inducement.

---

[81] 891 A.2d 1032 (Del Ch. 2006).

[82] *Id.* at 1059−64.

[83] *Id.* at 1060−61 (citations omitted)

[84] *Freebird Commc'ns, Inc. Profit Sharing Plan v. Roberts*, No. 2:18-cv-02026-HLT, 2019 WL 5964583, at *6 (D. Kan. Nov. 13, 2019) (citing *York*, 962 P.2d at 425); *see also Sprague*, 844 F. Supp. at 672 *(*quoting *Ridenhour*, 811 P.2d at 1232).

[85] Doc. 22 at 13.

Specifically, the nature of the act alleged is the misrepresentation and concealment of material facts regarding DataFile's existing customers and business outlook, with the purpose of increasing the purchase price or other consideration to be paid by Plaintiffs. Plaintiffs have alleged significant assistance by Defendants in the form of preparing documents relating to the validity, value, and historical performance of DataFile's customer contracts and DataFile's 2020 EBITDA; through making misrepresentations regarding the accuracy of that information during several conference calls with Plaintiffs; and by advising Akers not to disclose that a key client had directed DataFile to stop work on its contract. Because Plaintiffs have alleged that Defendants participated in calls during which they misrepresented the accuracy of the information provided, Plaintiffs have also alleged Defendants' presence at the time of the tortious act. Furthermore, "all parties participating in . . . concealment" may be "deemed to have been present at the act."[86] As to Defendants' relationship to the other parties, the Court finds the fact that they were representing Akers and Akers Holdco in negotiations adverse to Plaintiffs cannot be helpful to their position. Defendants' alleged financial incentive to induce Plaintiffs to enter into the MIPA on the terms most favorable to Akers and Akers Holdco, thereby increasing their commission—a "rapacious state of mind"—also weighs against them here.[87] Finally, Plaintiffs allege that Defendants provided assistance to Akers and Akers Holdco over a period of at least several months. The Court finds the foregoing allegations sufficient to state a claim under an aiding and abetting theory, and Defendants' motion to dismiss this claim is denied.

---

[86] *York*, 962 P.2d at 425.

[87] *Id.* (citing *Ridenhour*, 811 P.2d at 1234).

### G.      Conspiracy (Count VI)

Under Kansas law, the elements of a civil conspiracy include: "(1) two or more persons; (2) an object to be accomplished; (3) a meeting of the minds in the object or course of action; (4) one or more unlawful overt acts; and (5) damages as the proximate result thereof."[88] "Conspiracy is not actionable without commission of some wrong giving rise to a cause of action independent of the conspiracy."[89]  Finally, "[a] plaintiff must make more than conclusory allegations of the existence of a conspiracy; it must set forth some supporting factual details in order to sustain a claim for relief."[90] !

Defendants argue that Plaintiffs' conspiracy claim "is ripe for dismissal on three separate grounds."[91]  First, Defendants contend that Plaintiffs have failed to allege any viable tort claim against Lindsey or DVS, and that Plaintiffs cannot rely on unlawful acts by Akers and/or Akers Holdco to support a conspiracy claim against Defendants.  The parties have briefed at length whether an individual can be liable for civil conspiracy where that individual did not commit an independent, actionable tort.  The Court need not address these arguments, as it has found above that Plaintiffs have adequately stated multiple intentional tort claims against Defendants based on Defendants' own conduct.[92]

---

[88] *Ridenhour*, 811 P.2d at 1226 (quoting *Stoldt v. City of Toronto*, 678 P.2d 153, 161 (Kan. 1984)).

[89] *Stoldt*, 678 P.2d at 161.

[90] *Deere & Co. v. Zahm*, 837 F. Supp. 346, 350 (D. Kan. 1993) (citations omitted).

[91] Doc. 22 at 14.

[92] Plaintiffs' claim for negligent misrepresentation, however, cannot support a civil conspiracy claim. *See Gillespie v. Seymour*, 876 P.2d 193, 203 (Kan. 1994).

Second, Defendants contend that the "lone" paragraph of the Amended Complaint regarding the second element of a conspiracy claim consists of conclusory allegations and does not adequately describe the object of the conspiracy.[93]  That paragraph reads:

> The object of the conspiracy between Lindsey, DVS, Akers and Akers Holdco was to damage Plaintiffs by causing them to enter the MIPA with Akers and Akers Holdco and to pay inflated transaction consideration to Akers and Akers Holdco, which in turn would provide for increased compensation to Lindsey and DVS based on the value of the transaction.[94]

The Court does not find this paragraph particularly conclusory, and it is supported by numerous other allegations about the purpose of the conspiracy between Defendants, Akers, and Akers Holdco—to accomplish the sale of DataFile to Plaintiffs at an artificially inflated price, which resulted in increased compensation to Defendants for acting as the sellers' broker.[95]  Thus, although the words "object of the conspiracy" may be used only once in the Amended Complaint, Plaintiffs have adequately described the purpose to be accomplished by Defendants, Akers, and Akers Holdco in misrepresenting or withholding information relating to DataFile's customer relationships.

Third, Defendants argue that Plaintiffs have failed to allege a meeting of the minds. Defendants rely, in part, on an opinion by the undersigned in *Lee v. Kansas State University*, in which the Court found that the plaintiff had failed to allege sufficient facts to show a meeting of the minds.[96]  In that case, the plaintiff, a graduate student, alleged that university employees had conspired to dismiss her from the statistics graduate program under false pretenses, and argued that a meeting of the minds was evident in emails exchanged among the defendants

---

[93] Doc. 22 at 16.

[94] Doc. 18 ¶ 128.

[95] *See, e.g.*, Doc. 18 ¶¶ 17−19, 25, 68.

[96] No. 12-cv-2638-JAR-DJW, 2013 WL 2476702, at *12 (D. Kan. June 7, 2013).

discussing their conversations with each other about Plaintiff's "status as a student and her planned dismissal."[97]  The Court found that these allegations were "conclusory and lack[ed] the details that would allow [the] Court to deny Defendants' motion to dismiss"[98]

In this case, Plaintiffs allege that Defendants, Akers, and Akers Holdco "had a meeting of the minds in the object and course of action of the conspiracy as shown by their coordinated and concerted misrepresentations and omissions throughout the negotiation and closing of the MIPA."[99]  In contrast with certain cases on which Defendants rely, Plaintiffs' allegation regarding a meeting of the minds in this matter is supported by other factual averments detailing the alleged co-conspirators' shared knowledge of material changes in DataFile's customer relationships and their joint decision to misrepresent or withhold that information.[100] Critically, Plaintiffs point to a specific email from Akers to Lindsey in which she expressed concern that DataFile's cessation of work for InterMed would "trigger," which can reasonably be understood to mean that it would cause problems for the deal with Plaintiffs.  Lindsey initially said that the change in this client relationship would need to be disclosed, but later told Akers that this information need not be shared with Plaintiffs.

Given the totality of the facts alleged here, the Court finds that Plaintiffs have adequately pleaded a meeting of the minds and concerted action among Defendants, Akers, and Akers Holdco to fraudulently induce Plaintiffs to enter into the MIPA for their own financial gain.  Again, "Rule 9(b) does not work to penalize a plaintiff merely because he was not privy to, and, therefore, cannot plead the details of, the inner workings of a group of defendants who

---

[97] *Id.* (citation omitted).

[98] *Id.*

[99] Doc. 18 ¶ 129.

[100] *See, e.g.*, Doc. 18 ¶¶ 42–68.

allegedly acted in concert to defraud him."[101] !Whether any of Plaintiffs' claims can be proven remains to be seen, but the Amended Complaint "states allegations of a conspiracy sufficient to give the defendants fair notice of what the plaintiff[s'] claim is and the grounds on which it rests."[102]

### H.    Unjust enrichment (Count VII)

Finally, Plaintiffs bring a claim against Defendants for unjust enrichment, alleging that Defendants' misrepresentations and omissions resulted in artificial inflation of the amount Plaintiffs had to pay to acquire DataFile, and that as a result, Defendants received an inflated commission for their work as the sellers' broker.

The Kansas Supreme Court has explained "[u]njust enrichment is a modern version of the older doctrine of quasi-contract."[103]  "The basis of an unjust enrichment claim 'lies in a promise implied in law that one will restore to the person entitled thereto that which in equity and good conscience belongs to that person.'"[104]  "Like a contract claim, a quasi-contract arises when one party has conferred a benefit to the other without just compensation.  Rather than granting the aggrieved party relief under a contractual obligation, unjust enrichment awards compensation out of justice and equity."[105]  The elements of an unjust enrichment claim are: "(1) a benefit conferred upon the defendant by the plaintiff; (2) an appreciation or knowledge of the benefit by the defendant; and (3) the acceptance or retention by the defendant of the

---

[101] *Deere & Co. v. Zahm*, 837 F. Supp. 346, 350 (D. Kan. 1993) (quoting *Kravetz v. Brukenfeld*, 591 F. Supp. 1383, 1388 n.9 (S.D.N.Y.1984)).

[102] *Id.*

[103] *Corvias Military Living, LLC v. Ventamatic, Ltd.*, 450 P.3d 797, 804 (Kan. 2019) (citing *Haz–Mat Response, Inc. v. Certified Waste Servs., Ltd.,* 910 P.2d 839, 841, Syl. ¶ 5 (Kan. 1996)).

[104] *Id.* (quoting *Univ. of Kan. Hosp. Auth. v. Bd. of Wabaunsee Cnty. Comm'rs*, 327 P.3d 430, 441 (Kan. 2014)).

[105] *Id.* (citation omitted).

benefit under such circumstances as to make it inequitable for the defendant to retain the benefit without payment of its value."[106]  Recovery under the theory of unjust enrichment "does not depend on privity" of contract.[107]

Defendants contend that Plaintiffs' unjust enrichment claim fails because Plaintiffs conferred no benefit upon Lindsey and/or DVS; rather, Lindsey and DVS presumably received a commission for serving as the sellers' broker for Akers and/or Akers Holdco.  Defendants cite the Kansas Supreme Court's decision in *Haz–Mat Response, Inc. v. Certified Waste Services, Ltd.*,[108] a case involving an unjust enrichment claim by a subcontractor against a landowner, to support their argument that "absent special circumstances," a plaintiff cannot pursue an unjust enrichment claim against the recipient of an indirectly conferred benefit.[109] Plaintiffs quote the following language from that case:

> In the absence of evidence that the owner misled the subcontractor to his or her detriment, or that the owner in some way induced a change of position in the subcontractor to his or her detriment, or some evidence of fraud by the owner against the subcontractor, an action for unjust enrichment does not lie against the owner by a subcontractor.[110]

Defendants argue that in this case, Lindsey and DVS are analogous to the landowner in *Haz-Mat*, while Plaintiffs are analogous to the subcontractor.  Thus, under Defendants' position, the above quote would read:

> In the absence of evidence that Lindsey and/or DVS misled Plaintiffs to their detriment, or that Lindsey and/or DVS in some way induced a change of position in Plaintiffs to their detriment, or

---

[106] *J.W. Thompson Co. v. Welles Prods. Corp.,* 758 P.2d 738, 745 (Kan. 1988) (citations omitted).

[107] *Haz–Mat Response, Inc.*, 910 P.2d at 847 (citing 66 Am. Jur. 2d, *Restitution and Implied Contacts* § 2, at 943−44).

[108] 910 P.2d 839 (Kan. 1996).

[109] Doc. 22 at 19 (citing *Haz–Mat Response, Inc.*, 910 P.2d at 847).

[110] *Id.* at 19−20 (quoting *Haz–Mat Response, Inc.*, 910 P.2d at 847).

> some evidence of fraud by Lindsey and/or DVS against Plaintiffs, an action for unjust enrichment does not lie against Lindsey and/or DVS by Plaintiffs.

As set forth above, Plaintiffs have adequately alleged that Defendants misled and defrauded them, and the Court finds that these "special circumstances" are sufficient to support Plaintiffs' unjust enrichment claim at the pleading stage. Further, although the case law on this issue is not well-developed, Kansas courts have permitted recovery where a benefit was conferred indirectly on the unjustly enriched party.[111] In fact, multiple federal courts have recognized that Kansas law "does not require a showing of direct benefit."[112]

In their reply, Defendants contend that the Tenth Circuit's decision in *Spires v. Hospital Corp. of America* mandates the dismissal of Plaintiffs' unjust enrichment claim because it requires the direct conferral of a benefit.[113] In that case, the plaintiffs alleged that the defendant hospital corporation harmed the plaintiffs' decedents by maintaining inadequate staffing levels, and that the defendant had been unjustly enriched by this cost-saving practice.[114] The Tenth Circuit affirmed the district court's ruling that the plaintiffs had failed to allege that their deceased family members actually conferred a benefit on the defendant when they paid its subsidiary hospitals.[115] In the ruling affirmed by the Tenth Circuit,

---

[111] *See, e.g., Peterson v. Midland Nat'l Bank*, 747 P.2d 159, 167 (Kan. 1987) (affirming unjust enrichment award in favor of party who provided feed to cattle which defendant did not own but in which defendant had a security interest); *Sec. Ben. Life Ins. Corp. v. Fleming Cos., Inc*., 908 P.2d 1315, 1323 (Kan. Ct. App. 1995) (finding indirect benefit sufficient for unjust enrichment claim).

[112] *In re Packaged Seafood Prods. Antitrust Litig.*, 242 F. Supp. 3d 1033, 1090 (S.D. Cal. 2017) (concluding that Kansas does not require conferral of a direct benefit) (citations omitted); *see also, e.g., In re Automotive Parts Antitrust Litig.*, 50 F. Supp. 3d 836, 864 (E.D. Mich. 2014) (finding that under the law of Kansas and other states, lack of a directly conferred benefit does not doom unjust enrichment claims (collecting cases)); *In re Processed Egg Prods. Antitrust Litig.*, 851 F. Supp. 2d 867, 930 (E.D. Pa. 2012) (citing Kansas case law and finding that "Kansas unjust enrichment law allows claims for the conferral of indirect benefits") (citations omitted)).

[113] 289 F. App'x 269 (10th Cir. 2008).

[114] *Id.* at *1

[115] *Id.* at *3.

however, the district court actually stated that the plaintiffs' unjust enrichment claim was "subject to dismissal because there is no allegation that either of the plaintiffs themselves made any payments to their respective hospitals, and there are no allegations that any of these payment were ever tendered to [the defendant]."[116]  Thus, the outcome in *Spires* appears to have hinged upon the lack of *any* allegation of a benefit conferred, rather than upon a distinction between a direct and indirect benefit.

The Court finds *Spires* factually distinguishable from the present matter, in which Plaintiffs do allege that Defendants received a benefit through their commission, and is unconvinced that the Tenth Circuit's unpublished opinion in *Spires* announced a bright-line rule that no cause of action for unjust enrichment will lie when the benefit is conferred indirectly.  The equitable doctrine of unjust enrichment is "especially flexible" and "permits a party to recover the value of a benefit conferred on a second party when the second party retains the benefit under circumstances that either commonly would call for payment or would otherwise make retention of the benefit without compensation patently unfair."[117]  Again, whether any of Plaintiffs' claims hold water after discovery remains to be seen, but at the pleading stage, the Court finds Plaintiffs' unjust enrichment allegations sufficient and denies Defendants' motion to dismiss as to Count VII.

**IT IS THEREFORE ORDERED BY THE COURT** that Defendants' Motion to Dismiss Amended Complaint (Doc. 21) is **granted in part and denied in part.**  The motion is granted as to Count III, but denied as to Counts I, II, IV, V, VI, and VII.

**IT IS SO ORDERED.**

---

[116] *Spires v. Hosp. Corp. of Am.*, No. 06-2137-JTM, 2006 WL 2264024, at 5 (D. Kan. July 27, 2006), *aff'd in part and rev'd in part*, 289 F. App'x 269 (10th Cir. 2008).

[117] *JA-DEL, Inc v. Winkler*, No. 118,441, 2019 WL 166936, at *2 (Kan. Ct. App. Jan. 11, 2019) (citing *Haz–Mat Response, Inc. v. Certified Waste Servs., Ltd.,* 910 P.2d 839, 841, Syl. ¶ 6 (Kan. 1996)).

Dated: May 4, 2021

S/ Julie A. Robinson
JULIE A. ROBINSON
CHIEF UNITED STATES DISTRICT
JUDGE