UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

TP ST ACQUISITION, LLC, et al.,

      Plaintiffs,

      v.                       Case No. 21-2020-JAR

KEVIN LINDSEY, et al.,

      Defendants.

## **ORDER**

      This case involves a business deal gone south.  Highly summarized, the plaintiffs, TP ST Acquisition, LLC and TP ST Holdco, allege they were tricked into purchasing a company at an inflated price because the sellers, Janine Akers and Akers DFT Holdco, Inc. (the "Akers Signatories"), acting upon the investment advice of defendants Kevin Lindsey and the DVS Group, LLC, misrepresented and concealed material facts.  Plaintiffs have sued the Akers Signatories in Delaware Superior Court and defendants in this court in Kansas.

      A dispute has arisen over six documents containing e-mail communications between the Akers Signatories and the lawyers who advised them in the sale.  Plaintiffs attempted to introduce the communications as exhibits during Lindsey's recent deposition.  Counsel for defendants and the Akers Signatories immediately asserted privilege over the documents and "clawed them back" under the provisions of the Agreed Protective Order

1

entered in this case.[1]  Plaintiffs now move to compel production of the documents, arguing they were either never privileged or any privilege or protection they once had was waived (**ECF No. 85**).

The Akers Signatories, based on their asserted privilege over the documents, have been granted leave to intervene for the limited purpose of responding to plaintiffs' motion.[2] Defendants also responded,[3] and plaintiffs' have replied to both responses.[4]  Because the court finds that the majority of the communications are protected from disclosure by either the attorney-client privilege or the work-product doctrine, and that this protection was not waived, the motion to compel is denied in all but three instances.

## BACKGROUND

The Akers Signatories owned DataFile Technologies, LLC, a Kansas-based healthcare-technology company.  In June 2016, Akers hired defendants to advise her and facilitate the potential sale of DataFile.[5]  ScanSTAT Technologies, LLC, was a Delaware company, also in the healthcare-technology business.  The two companies began discussing a merger.  Akers retained the law firm Polsinelli, LLP to provide legal advice about an actual or potential sale.  ScanSTAT formed the plaintiff entities to carry out its purchase of

---

[1] *See* ECF No. 28.

[2] ECF Nos. 95, 96.

[3] ECF No. 94.

[4] ECF Nos. 100 & 101.

[5] ECF No. 93-3.

O:\ORDERS\21-2020-JAR-85.docx

DataFile.  Eventually, on March 27, 2020, the Akers Signatories and plaintiffs executed a Membership Interest Purchase Agreement ("MIPA").[6]  Under the MIPA, Akers obtained a minority stake in the merged company, plaintiff TP ST Holdco.

In October 2020, plaintiffs filed suit against the Akers Signatories and defendants in Delaware state court, alleging they conspired to induce the merger by making false statements about DataFile.[7]  Defendants challenged the Delaware court's jurisdiction over them, leading plaintiffs to dismiss their claims against defendants in Delaware and refile the claims in this court.  The Akers Signatories asserted a number of counterclaims in the Delaware case.  After the Delaware court held that a forum-selection clause applied to some of the Akers Signatories' claims, the Akers Signatories filed a separate suit in Georgia state court.  The related cases are currently being litigated.

On November 4, 2021, plaintiffs deposed Lindsey, individually and in his capacity as corporate representative of DVS Group.  By agreement of counsel, the deposition was for both this case and the Delaware case, with counsel for plaintiffs, defendants, and the Akers Signatories participating.  During the deposition, plaintiffs marked as exhibits six documents that are the subject of this motion.  The documents are copies of e-mail communications, dated between January 16, 2020 and June 11, 2020, involving Akers and Polsinelli (and sometimes defendants and defense counsel), which defendants had

---

[6] ECF No. 93-1.

[7] ECF No. 93-4.

produced in discovery.  When the documents were marked, counsel for defendants and separate counsel for the Akers Signatories objected that the documents were privileged and should not be part of the record.  Defense counsel asserted they were inadvertently produced and asked plaintiffs to return the documents under the clawback provision of the Agreed Protective Order.  Plaintiffs obliged.  But plaintiffs dispute the clawback was proper.  They argue defendants intentionally produced the subject e-mails and that the e-mails were either never privileged or any privilege that once attached was waived. Plaintiffs ask the court to order defendants to re-produce the documents.

## ANALYSIS

## I.  <u>Are the Documents Privileged or Protected (Aside From Waiver by Production)?</u>

Plaintiffs first assert that the six e-mails are not privileged.  They argue the e-mails should be deemed not privileged because defense counsel informed plaintiffs' counsel prior to the deposition that all e-mails defendants produced that involved Polsinelli had been reviewed by defense counsel and deemed "not privileged."  Defense counsel's actions are relevant to the court's analysis below of plaintiffs' waiver-by-production argument.  But whether a communication is covered by the attorney-client privilege or work-product doctrine is for the court, not counsel, to decide.  Thus, the court first evaluates whether the attorney-client privilege or work-product doctrine protects the subject e-mails—separate and apart from whether protection was later waived during discovery.

4

In Kansas, the attorney-client privilege is codified at Kan. Stat. Ann. § 60-426.[8] "Under the statute, with few exceptions, 'communications found by the judge to have been between [a] lawyer and his or her client in the course of that relationship and in professional confidence, are privileged.'"[9] The term "communication" includes "advice given by the attorney in the course of representing the client and . . . disclosures of the client to a representative, associate or employee of the attorney incidental to the professional relationship."[10] The privilege does not apply, however, "to every communication between

---

[8] The court has subject-matter jurisdiction over this lawsuit based on diversity of citizenship, and plaintiffs' complaint brings claims of conspiracy, tortious interference, fraudulent inducement, negligent misrepresentation, and unjust enrichment. Because state law provides the rule of decision for all of plaintiffs' claims, Fed. R. Evid. 501 dictates state law governs the application of privilege asserted here. *Skepnek v. Roper & Twardowsky, LLC*, No. 11-4102-DDC, 2014 WL 4377706, at *4 (D. Kan. Sept. 4, 2014). "When Rule 501 requires application of state privilege law and there are factual connections to more than one state, federal courts engage in a choice-of-law analysis and employ the choice-of-law principles of the forum state." *Id.* (citing *Klaxon v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496 (1941)). Courts in our district have determined "that the Kansas Supreme Court would apply Kansas state law to determine matters of privilege." *Lawson v. Spirit AeroSystems, Inc.*, 410 F. Supp. 3d 1195, 1205 (D. Kan. 2019); *see also Skepnek*, 2014 WL 4377706, at *4 (holding "the Kansas Supreme Court would apply Kansas state law to determine the applicability of the attorney-client privilege"). Thus, the court generally will apply Kansas law (and federal cases applying Kansas law) in deciding the applicability of the attorney-client privilege.

[9] *Lawson*, 410 F. Supp. 3d at 1205 (applying Kansas law) (quoting *State v. Gonzalez*, 234 P.3d 1, 10 (Kan. 2010)).

[10] Kan. Stat. Ann. § 60-426(c)(2). *See also Harlow v. Sprint Nextel Corp.*, 2012 WL 646003, No. 08-2222-KHV, at *5 (D. Kan. Feb. 28, 2012) (holding privilege "also "protects confidential communications made by a client to an attorney in order to obtain legal assistance from the attorney in his or her capacity as a legal advisor"); *Upjohn Co. v. United States*, 449 U.S. 383, 390 (1981) ("[T]he privilege exists to protect not only the

5

attorney and client."[11]   "To be privileged, communications must be confidential and involve the requesting or giving of legal advice."[12]  Legal advice must predominate; the privilege does not attach to business advice.[13]  "Further, underlying facts do not become privileged merely because they are conveyed between attorney and client."[14]  As the parties asserting the privilege as a bar to discovery, defendants and the Akers Signatories have the burden of establishing the privilege applies.[15]

The six e-mails, as described by defendants and the Akers Signatories,[16] fall into two categories: those relating to the negotiation of the sale of DataFile by Akers to ScanSTAT (dated January 16, 2020 - March 19, 2020), and those relating to plaintiffs'

---

giving of professional advice to those who can act on it but also the giving of information to the lawyer to enable him to give sound and informed advice.").

[11] *Cypress Media, Inc. v. City of Overland Park*, 997 P.2d 681, 690 (Kan. 2000); *see also Motley v. Marathon Oil Co*., 71 F.3d 1547, 1550–51 (10th Cir. 1995) ("[T]he mere fact that an attorney was involved in a communication does not automatically render the communication subject to the attorney-client privilege.").

[12] *Lawson,* 410 F. Supp. 3d at 1212 (citing Kan. Stat. Ann. § 60-426).

[13] *Id.* (citing *In re Universal Serv. Fund Tel. Billing Practices Litig*., 232 F.R.D. 669, 675 (D. Kan. 2005)).

[14] *Id.* (citing *In re Grand Jury Proceedings*, 616 F.3d 1172, 1182 (10th Cir. 2010)).

[15] *Lawson*, 410 F. Supp. 3d at 1206; *Harlow*, 2012 WL 646003 at *5 (citing *Peat, Marwick, Mitchell & Co.,* 748 F.2d 540, 542 (10th Cir. 1984)). This burden includes showing the privilege has not been waived, *Lawson*, 410 F. Supp. 3d at 1206; waiver is addressed below.

[16] Each of the below descriptions includes information taken from the response memoranda of defendants, ECF No. 94 at 4-8, and the Akers Signatories, ECF No. 96 at 8-9.

6

post-sale threats of litigation (dated June 1, 2020 - June 11, 2020).

      A.     <u>Communications Related to Pre-Sale Negotiations</u>

Defendants and the Akers Signatories assert the following four documents are protected by the attorney-client privilege because they involve the giving or seeking of legal advice pertaining to the sales transaction of DataFile to ScanSTAT:

<u>DVS9556-9558:</u> January 16, 2020 e-mail from Lindsey to Polsinelli attorneys and Akers;[17] "reports on transaction-related communications with [ScanSTAT principals], discusses potential transaction timetables and numbers, and seeks advice on various deal components;" "references a telephone call between Lindsey and Polsinelli regarding a buyer-side disclosure issue."

<u>DVS9681-9684:</u> January 29, 2020 e-mail from Lindsey to Polsinelli attorneys; "discusses the status of a letter of intent, the status of a proposed deal structure, and the Polsinelli lawyers responsible for specific transaction documents," and "discusses negotiation strategy."

<u>DVS1671-1678:</u> March 13, 2020 e-mail time stamped 2:47 p.m., from a Polsinelli attorney to Akers, with a copy to Lindsey and another Polsinelli attorney; asks Akers questions so that Polsinelli could "respond to legal due diligence requests" from ScanSTAT counsel and to their questions "about schedules for the transaction."

<u>DVS15967-16108:</u> e-mail string including one e-mail from March 13, 2020, and three e-mails from March 19, 2020, between Polsinelli attorneys and Akers, with copies to Lindsey; discusses "legal advice" and "a legal issue in the transaction documents" related

---

[17] The description of this e-mail by defendants, but not by the Akers Signatories, includes "two of Akers tax advisors" as recipients. ECF No. 94 at 4. If the tax advisors were actual recipients, neither plaintiffs nor anyone else address whether their presence destroyed the attorney-client privilege. The court will not wade into this issue because plaintiffs have not moved to compel on this basis.

to legal due diligence requests from ScanSTAT counsel; attaches "drafts of transaction documents."[18]

As to each of these e-mails, plaintiffs argue Lindsey's presence in the communications destroys the attorney-client privilege between the Akers Signatories and their attorneys from Polsinelli.[19]  "Generally, when a client communicates with his or her attorney in the presence of a third party or voluntarily discloses privileged communications, attorney-client privilege is waived."[20]  Defendants and the Akers Signatories respond that Lindsey was acting in his capacity as an authorized representative of the Akers Signatories, i.e., as the "client," and thereby did not waive the privilege.

Kan. Stat. Ann. § 60-426(c)(1) defines the "client" for purposes of the attorney-client privilege to include "a corporation or other association that, directly *or through an authorized representative*, consults an attorney . . . for the purpose of  . . . securing legal advice from the attorney in a professional capacity."[21]  Interpreting this statutory language

---

[18] A copy of DVS1671-1678 was also included in this e-mail string.  The court's holding below about DVS1671-1678 also applies to that particular communication in DVS15967-16108.

[19] No one disputes the Akers Signatories are the "client" for purposes of the assertion of attorney-client privilege over these communications.  *See Watchous Enterprises, L.L.C. v. Pac. Nat'l Cap.*, No. 16-1432-JTM, 2017 WL 4310231, at *4 (D. Kan. Sept. 28, 2017) (applying Kansas law) ("It is well-settled that the attorney-client privilege belongs to the client. . . .").  *See also* ECF No. 94 at 9 ("Four of the documents involve a privilege that belongs to Akers rather than Lindsey or DVS . . . .").

[20] *Lawson*, 410 F. Supp. 3d at 1206 (citing *State ex rel. Stovall v. Meneley*, 22 P.3d 124, 141-42 (Kan. 2001)).

[21] Kan. Stat. Ann. § 60-426(c)(1) (emphasis added).

8

in *Pipeline Prods., Inc. v. Madison Companies, LLC*, U.S. Magistrate Judge Angel D. Mitchell ruled a non-employee consultant can serve as the "client" seeking legal advice on behalf of a corporation, so long as the corporation authorized such consultation.[22]  Other cases in our district, applying similar federal standards, have reached the same result.[23]  The party asserting privilege bears the burden to establish the client authorized the consultant to secure legal advice in its behalf.[24]  "This includes submitting a factual record from which the court can find that the corporation authorized the independent contractor to consult with attorneys for the purpose of securing legal advice for the corporation."[25]

To develop the factual record, defendants and the Akers Signatories present the Engagement Agreement between the two, in which defendants agreed to provide services

---

[22] *Pipeline Prods., Inc. v. Madison Cos., LLC*, No. 15-4890-KHV, 2019 WL 1900341, at *2 (D. Kan. Apr. 29, 2019) (finding communications between an independent contractor and attorneys were covered by the attorney-client privilege); *Lawson*, 410 F. Supp. 3d at 1206.

[23] *See, e.g., In re Syngenta AG MIR 162 Corn Litig.,* No. 14-md-2591-JWL, 2017 WL 2555834, at *6 (D. Kan. June 13, 2017) ("The presence of a third party in an e-mail transmission, for instance, will not destroy the attorney-client privilege if the third party is the attorney's or client's agent...." (citation omitted)); *High Point SARL v. Sprint Nextel Corp.*, No. 09-2269-CM, 2012 WL 234024, at *13 (D. Kan. Jan. 25, 2012) ("The presence of a third-party, such as a consultant, does not destroy the attorney-client privilege where that party is the client's agent or possesses a commonality of interest with the client. (quotation marks and citation omitted)).

[24] *Pipeline Prods.*, 2019 WL 1900341, at *3.

[25] *Lawson*, 410 F. Supp. 3d at 1206 (citing *Pipeline Prods.*, 2019 WL 1900341, at *3).

9

related to the sale of DataFile.[26]   In the agreement, Akers engaged defendants "on an exclusive basis to advise and assist . . . in preparing to seek a sale transaction of the assets."[27]  Defendants agreed to, among other things,

> 6. Coordinate the involvement of other professional advisors, including your attorney and accountant. . . .
>
> 8.  Negotiate on your behalf with potential buyers and advise you regarding price and deal structure.
>
> 9.  Counsel you throughout the due diligence period.
>
> 10.  Work closely with . . . your professional advisory team to complete the transaction in an expedient and professional manner.[28]

It's a close call (and defendants and the Akers Signatories perhaps should have beefed up the factual record to strengthen their position), but the court ultimately is persuaded Lindsey was acting as an authorized representative of Akers and DataFile when seeking legal advice from their attorneys at Polsinelli.   Although the Engagement Agreement does not explicitly state that Lindsey was "authorized" to secure legal advice on behalf of Akers and DataFile, considering the Agreement as a whole, it is apparent that Akers contemplated Lindsey doing just that.   As stated, Lindsey's role included coordinating with and "work[ing] closely with" Akers's attorneys to negotiate the sale and

---

[26] ECF No. 93-3.

[27] *Id.* at 1.

[28] *Id.* at 1-2.

facilitate legal due diligence.  The record supports a finding that Lindsey acted in this prescribed role and was actively engaged, as a representative of Akers, in the legal aspects of the transaction.  The court therefore finds Lindsey's presence in the above communications did not destroy the attorney-client privilege.[29]

Plaintiffs present an additional challenge to the attorney-client privilege assertion over DVS1671-1678.  Defendants describe this e-mail from a Polsinelli attorney to Akers as presenting questions to Akers that would help her attorneys "respond to legal due diligence requests" from ScanSTAT counsel.[30]  The Akers Signatories describe it as seeking to discuss questions from ScanSTAT counsel "about schedules for the transaction."[31]  Plaintiffs note that no one describes the e-mail as providing legal advice.

The court finds the Akers Signatories and defendants have failed to meet their burden of demonstrating this e-mail is protected by the attorney-client privilege.  This court

---

[29] The Akers Signatories also assert Lindsey's presence on communications involving the sales negotiations did not waive their attorney-client privilege because Lindsey shared a common legal interest with them. ECF No. 96 at 12-13.  The common-interest doctrine is discussed below, but at this point it is sufficient to say the Akers Signatories have not convinced the court the doctrine applies to the pre-sale negotiations by their terse and conclusory statement that "the Akers Signatories and Defendants shared an interest in securing legal advice on the merger  agreement."  *Id.* at 13.  This is an academic point, however, as the court has held here that Lindsey's presence did not waive the privilege because he was acting as an authorized agent on behalf of the Akers Signatories.

[30] ECF No. 94 at 5-6.

[31] ECF No. 96 at 8.

has repeatedly explained that "[u]nderlying facts are not protected by the privilege,"[32] including facts conveyed to a client by their attorney which the attorney obtained from independent sources.[33]  Moreover, when an attorney is simply acting as a conduit, relaying questions to his client from a third party, the communication is not protected by the attorney-client privilege.[34]  From what the court can tell, this e-mail simply relayed questions.  It even appears the questions may have pertained to administrative issues like scheduling or timing, not to legal advice or the mental impressions of the attorney.  Thus, plaintiffs' motion is granted as to this e-mail, and **defendants are ordered to re-produce DVS1671-1678.**

   B.   <u>Communications Related to Post-Sale Litigation</u>

   Defendants and the Akers Signatories assert the remaining two documents are protected by the attorney-client privilege and the work-product doctrine because they involve legal advice pertaining to post-sale legal disputes that are the subject of the current litigation between the parties:

---

[32] *In re Syngenta,* 2017 WL 2555834, at *2 (quoting *Sprint Commc'ns Co. v. Comcast Cable Commc'ns, LLC,* Nos. 11-2684, 11-2685, 11-2686, 2014 WL 545544, at *4 (D. Kan. Feb. 11, 2014)  and *Williams v. Sprint/United Mgmt. Co.*, No. 03–2200, 2006 WL 1867478, at *10 (D. Kan. July 1, 2006)); *see also Lawson,* 410 F. Supp. 3d at 1212 (applying Kansas law).

[33] *Sprint Commc'ns Co., L.P. v. Theglobe.com, Inc.*, 236 F.R.D. 524, 529 (D. Kan. 2006).

[34] *See In re Grand Jury Proc.*, 616 F.3d at 1183 ("[W]here the attorney was acting as a 'conduit' for non-confidential information, the client may not invoke the attorney-client privilege.").

DVS15778-15783: one page with two e-mails dated June 1, 2020.  The earlier e-mail, time stamped 3:13 p.m., is from a Polsinelli attorney to defense counsel "regarding the Akers Signatories' response to a litigation demand letter from ScanSTAT."[35]  The later e-mail, time stamped 3:16 p.m., is from defense counsel to Lindsey and forwards the earlier e-mail.[36]

DVS13503-13505: string of five e-mails dated June 11, 2020, time stamped between 8:29 a.m. and 11:39 a.m.; all include Lindsey, Akers, defense counsel, and three Polsinelli attorneys; "relate to" a group call to discuss a settlement proposal to plaintiffs; the last e-mail attaches an Excel spreadsheet summarizing information for a potential settlement with plaintiffs.[37]

In these post-sale communications, there is no dispute Lindsey was acting on behalf of himself and DVS, rather than on behalf of the Akers Signatories.  Nonetheless, defendants and the Akers Signatories assert he shared a common legal interest with the Akers Signatories, such that his presence did not waive attorney-client or work-product protection.  "The common-interest doctrine is an exception to waiver that may protect information and documents shared outside of the attorney-client relationship."[38]  The Tenth Circuit recognizes the doctrine as "a shield to preclude waiver of the attorney-client privilege when disclosure of confidential information is made to a third party who shares

---

[35] ECF No. 96 at 8.

[36] The e-mails included as an attachment a copy of the letter from Polsinelli sent to plaintiffs in response to their litigation-demand letter; no privilege is asserted over the letter.  *See* ECF No. 94 at 7.

[37] *Id.*

[38] *Lawson*, 410 F. Supp. 3d at 1209 (citing *In re Teleglobe Commc'ns Corp.*, 493 F.3d 345, 362-66 (3d Cir. 2007) and *In re Qwest Commc'ns Int'l Inc.*, 450 F.3d 1179, 1195 (10th Cir. 2006)).

a community of interest with the represented party."[39]  Although Kansas state courts have not explicitly recognized the common-interest doctrine, our court has found "Kansas state courts would follow the weight of authority and apply the doctrine to prevent waiver of attorney-client privilege where parties share a common interest."[40]

However, "[b]ecause the common interest doctrine (sometimes referred to as joint defense doctrine) is an exception to waiver, rather than a stand-alone privilege, there must be an applicable underlying privilege before the doctrine comes into consideration."[41] Thus, before considering the interest alignment of defendants and the Akers Signatories, the court must consider whether these parties have otherwise established the applicability of the attorney-client privilege or work-product doctrine to DVS15778-15783 and DVS13503-13505.

1.    *Attorney-Client Privilege*

Plaintiffs note that neither defendants nor the Akers Signatories describe these

---

[39] *Phillips v. Boilermaker-Blacksmith Nat'l Pension Tr.*, No. 19-2402-TC, 2021 WL 4453574, at *5 (D. Kan. Sept. 9, 2021) (quoting *Violetta v. Steven Brothers Sports Mgmt., LLC*, No. 16-1193-JTM, 2017 WL 3675090, at *13 (D. Kan. Aug. 24, 2017)).

[40] *Lawson*, 410 F. Supp. 3d at 1209 n.3; *see also Hibu Inc. v. Peck*, No. 16-1055-JTM, 2016 WL 6804996, at *5 (D. Kan. Nov. 17, 2016) (applying common-interest doctrine in diversity case where Kansas law governed); *Sawyer v. Sw. Airlines*, No. 01-2385-KHV, 2002 WL 31928442, at *3 (D. Kan. Dec. 23, 2002) (same).

[41] *Servicemaster of Salina, Inc. v. United States*, No. 11-1168-KHV, 2012 WL 1327812, at *3 (D. Kan. Apr. 17, 2012).  *See also Sawyer,* 2002 WL 31928442, at *3 ("The common interest doctrine can only exist where there is an applicable underlying privilege, such as the attorney-client privilege or the work-product doctrine.").

14

documents as seeking or providing legal advice, and have thereby failed to meet their burden of proving the privilege applies. The court largely agrees. As discussed above, not all communications involving attorneys are privileged.[42] "To be privileged, communications must . . . involve the requesting or giving of legal advice."[43] "[U]nderlying facts do not become privileged merely because they are conveyed between attorney and client."[44] The court has searched the briefs of defendants and the Akers Signatories for some description of the documents that would qualify them as falling under the attorney-client privilege, but has come up empty handed, save for one spreadsheet attachment.

DVS15778-15783 is described to consist of an e-mail from the Akers Signatories' counsel to defense counsel "regarding,"[45] "concerning,"[46] and "about"[47] the Akers Signatories' letter in response to a litigation-demand letter from plaintiffs and attaching a copy of the non-privileged response letter.[48] Defense counsel then forwarded the e-mail to

---

[42] *Cypress Media, Inc.*, 997 P.2d at 690. *See also Motley v. Marathon Oil Co.,* 71 F.3d 1547, 1550–51 (10th Cir. 1995) ("[T]he mere fact that an attorney was involved in a communication does not automatically render the communication subject to the attorney-client privilege.").

[43] *Lawson*, 410 F. Supp. 3d at 1212 (citing Kan. Stat. Ann. § 60-426).

[44] *Id.* (citing *Grand Jury Proceedings*, 616 F.3d at 1182).

[45] ECF No. 96 at 8.

[46] ECF No. 94 at 6.

[47] *Id.*

[48] No party asserts privilege over the response letter.

15

his client.  There is no indication that either the original or forwarded e-mail discussed legal strategy or otherwise did anything more than convey the fact that the Akers Signatories responded to plaintiffs' litigation-demand letter.  The court therefore finds defendants and the Akers Signatories, as the parties asserting the privilege, have failed to meet their burden of showing the privilege applies to these two e-mails.

Likewise, DVS13503-13505 is described as including a string of e-mails involving the Akers Signatories, defendants, and their respective attorneys "relate[d] to" a group call.[49]  The Akers Signatories state the group call is "regarding transaction issues,"[50] while defendants state it is "to discuss a settlement proposal to plaintiffs."[51]  Simply stating the e-mails relate to a group call, even a call to discuss legal settlement issues (as opposed to transactional business issues), does not demonstrate the e-mails themselves provide or seek confidential legal advice or strategy.  They may simply be an exchange of schedules, with recipients chiming in with their availability for the call.  Although defendants represent the e-mail exchange was "in direct response" to plaintiffs' letter threatening litigation,[52] this representation does not indicate that the substance of the exchange involved legal advice. The court therefore finds defendants and the Akers Signatories have failed to meet their

---

[49] ECF No. 94 at 7.

[50] ECF No. 96 at 9.

[51] ECF No. 94 at 7.

[52] *Id.*

burden of showing the attorney-client privilege applies to the e-mails copied in this document.

DVS13503-13505 includes, however, a copy of a spreadsheet that defendants describe as "summarizing information for a potential settlement structure with plaintiffs."[53] The spreadsheet was attached to the final e-mail in the string.  A potential settlement structure would, by its terms, almost necessarily relate to legal advice.  Plaintiffs do not assert otherwise or challenge the initial application of the attorney-client privilege (pre-waiver) to this spreadsheet.[54]  The court is satisfied defendants and the Akers Signatories have met their burden to establish the spreadsheet is protected by the attorney-client privilege.

### 2.  *Work-Product Protection*

Defendants and the Akers Signatories next argue the e-mails comprising DVS15778-15783 and DVS13503-13505 are protected by the work-product doctrine, even if not protected by the attorney-client privilege.  The court agrees, with two exceptions.

---

[53] *Id.*

[54] Although plaintiffs do not raise an issue about the "form" of the communication, the court notes a spreadsheet may be subject to the attorney-client privilege if it reflects privileged communications.  *See, e.g., Narayanan v. Sutherland Glob. Holdings Inc.,* 285 F. Supp. 3d 604, 614 (W.D.N.Y. 2018); *In re OM Sec. Litig.,* 226 F.R.D. 579, 590 (N.D. Ohio 2005); *Deel v. Bank of Am., N.A.,* 227 F.R.D. 456, 463 (W.D. Va. 2005).

The work-product doctrine is governed by the uniform federal standard set forth in Fed. R. Civ. P. 26(b)(3),[55] which provides: "Ordinarily, a party may not discover documents and tangible things that are prepared in anticipation of litigation or for trial by or for another party or its representative (including the other party's attorney, consultant, surety, indemnitor, insurer, or agent)."   Thus, for documents to be protected under the work-product doctrine, the party claiming the protection must demonstrate "(1) the materials sought to be protected are documents or tangible things; (2) they were prepared in anticipation of litigation or for trial; and (3) they were prepared by or for a party or a representative of that party."[56]  "Like the attorney-client privilege, the party asserting work-product protection must make a 'clear showing' that it applies."[57]   The party "must demonstrate the document was prepared principally or exclusively to assist in anticipated or ongoing litigation and establish the underlying nexus between the preparation of the document and the specific litigation."[58]

Applying the three factors, defendants assert the e-mails in question (1) are documents, (2) prepared in anticipation of the litigation threatened by plaintiffs in plaintiffs' May litigation-demand letter, and (3) prepared by counsel for the Akers

---

[55] *Lawson*, 410 F. Supp. 3d at 1207 (citing *Frontier Ref., Inc. v. Gorman-Rupp Co.*, 136 F.3d 695, 702 n.10 (10th Cir. 1998)).

[56] *U.S. Fire Ins. Co. v. Bunge N. Am., Inc.*, 247 F.R.D. 656, 657 (D. Kan. 2007) (citing *Johnson v. Gmeinder*, 191 F.R.D. 638, 643 (D. Kan. 2000)).

[57] *Lawson*, 410 F. Supp. 3d at 1207 (quoting *U.S. Fire Ins. Co.*, 247 F.R.D. at 658).

[58] *Kannaday v. Ball*, 292 F.R.D. 640, 649 (D. Kan. 2013).

Signatories and defendants.[59]  Plaintiffs do not dispute these three elements of the work-product doctrine are satisfied.[60]

The court finds defendants' (unopposed) application of the elements correct as to the e-mails prepared by counsel.  But two e-mails found in DVS13503-13505 (those time stamped 8:29 a.m. and 11:39 a.m.) are described as being sent by Lindsey.[61]  Although, as set out above, the work-product doctrine certainly can apply to documents prepared by a party, defendants and the Akers Signatories fail even to address e-mails not prepared by counsel.  Thus, defendants and the Akers Signatories have not met their burden of demonstrating the e-mails sent by Lindsey were prepared principally to assist in the anticipated litigation against plaintiffs.

The court has found defendants and the Akers Signatories have failed to demonstrate the applicability of either the attorney-client privilege or the work-product doctrine to the e-mails in DVS13503-13505 time stamped 8:29 a.m. and 11:39 a.m.  Thus, plaintiffs' motion is granted as to these two e-mails, and **defendants are ordered to re-**

---

[59] ECF No. 94 at 6-8.  *See also* ECF No. 96 at 12 n.3 (similar argument by the Akers Signatories).

[60] Rather, plaintiffs assert the work-product doctrine is "inapplicable" because, after being put on notice that the documents had been produced in discovery, defense counsel maintained they were not privileged.  ECF No. 100 at 7.  This argument is addressed below in Section II.

[61] ECF No. 94 at 7.

**produce the portion of DVS13503-13505 containing e-mails time stamped 8:29 a.m. and 11:39 a.m.**

### 3.    *The Common-Interest Doctrine*

Finally, the court addresses plaintiffs' argument that even if DVS15778-15783 and DVS13503-13505 are deemed otherwise protected by the attorney-client privilege or work-product doctrine (as they have been with the exception of two e-mails in DVS13503-13505), that protection was waived when the documents where shared at the time with third parties outside the attorney-client relationship.  As noted above, defendants and the Akers Signatories assert any such waiver is blocked by the application of the common-interest doctrine.

To be protected under the common-interest doctrine, "communications must be made in the course of a 'joint effort with respect to a common legal interest' and for the purpose of furthering that effort."[62]  The nature of the common interest must "be identical, not similar, and be legal, not solely commercial."[63]  Even communications between non-attorneys who share a common legal interest may be deemed protected by the attorney-

---

[62] *Lawson*, 410 F. Supp. 3d at 1209 (quoting *United States v. BDO Seidman, LLP*, 492 F.3d 806, 815-16 (7th Cir. 2007)); *see also Phillips*, 2021 WL 4453574, at *5 ("The communication must be made to advance their shared interest.").

[63] *D.M. v. Wesley Med. Ctr. LLC*, No. 18-2158-KHV, 2019 WL 4537211, at *2 (D. Kan. Sept. 19, 2019) (quoting *Sawyer*, 2002 WL 31928442, at *3); s*ee also Lawson*, 410 F. Supp. 3d at 1209.

client privilege under the doctrine.  So long as the communication is made for the purpose of seeking or discussing advice about the shared legal interest, the privilege is not waived.[64]

Defendants and the Akers Signatories argue they had a common interest arising from the May 22, 2020 "litigation threats from plaintiffs."[65]  Defendants state plaintiffs' threats "target[ed] defendants along with Akers."[66]  Defendants argue the e-mails about a June 1, 2020 response letter and about a June 11, 2020 call to discuss a settlement proposal to plaintiffs (along with the spreadsheet containing confidential information about that proposal) are in "direct response" to plaintiffs' threatened litigation against both the Akers Signatories and defendants.[67]  It is undisputed that plaintiffs' "threats culminated in Plaintiffs' Delaware lawsuit,"[68] filed roughly four months later against the Akers Signatories and defendants and alleging (among other things) they conspired with each other to provide false and misleading information about DataFile's customers.[69]

---

[64] *Lawson,* 410 F. Supp. 3d at 1211 ("The court believes that Kansas state courts would follow this approach, which accounts for the 'realities of communications between attorneys and clients and between non-lawyers who share a common legal interest.'" (quoting *Crane Sec. Techs., Inc. v. Rolling Optics, AB*, 230 F. Supp. 3d 10, 21 (D. Mass. 2017))).

[65] ECF No. 94 at 6; *see also* ECF No. 96 at 13 ("After the deal closed, the Akers signatories and Defendants shared an interest in securing legal advice regarding Plaintiffs' litigation threats.")

[66] ECF No. 94 at 7.

[67] *Id.*

[68] ECF No. 96 at 12 n.3.

[69] *See* ECF No. 93-4 (complaint in Delaware Superior Court).

On this record, the court finds defendants and the Akers Signatories have shown they had a common legal interest in responding to plaintiffs' notice of potential litigation. Based on defendants' characterization of the substance of plaintiffs' litigation-demand letter—which plaintiffs do not challenge—plaintiffs informed defendants and the Akers Signatories that plaintiffs were considering suing them all.[70]   The suit that ultimately resulted brought allegations that defendants conspired with the Akers Signatories during the negotiation stage of the sale and merger of DataFile.[71]   The fact the suit was filed shortly after the exchange of e-mails further supports a finding that defendants and the Akers Signatories had a common legal interest in defending against plaintiffs' conspiracy allegations.

The court further finds the e-mails from and between counsel representing defendants and the Akers Signatories in connection with plaintiffs' litigation threats were "communications . . . made in the course of a 'joint effort with respect to a common legal interest' and for the purpose of furthering that effort."[72]   As to the spreadsheet that was

---

[70] Unfortunately, a copy of plaintiffs' litigation-demand letter is not in the record.

[71] *See also* ECF No. 18 (amended complaint) at ¶ 16 ("Lindsey and DVS [] knowingly and intentionally coordinated and conspired with Ms. Akers and Akers Holdco to hide from ScanSTAT certain material facts and information . . . .") and ¶ 129 ("Lindsey, DVS, Akers, and Akers Holdco had a meeting of the minds in the object and course of action of the conspiracy as shown by their coordinated and concerted misrepresentations and omissions throughout the negotiation and closing of the MIPA . . . .").

[72] *Lawson*, 410 F. Supp. 3d at 1209; *see also Phillips*, 2021 WL 4453574, at *5 ("The communication must be made to advance their shared interest.").

attached to an e-mail in DVS13503-13505, the court is satisfied the communication in the spreadsheet was made for the purpose of seeking or discussing advice about defendants' and the Akers Signatories' shared legal interest in addressing plaintiffs' concerns and "settling" with plaintiffs before litigation.  Because the common-interest doctrine applies, neither the attorney-client privilege (applicable to the spreadsheet) nor work-product protection (applicable to the attorney emails in DVS15778-15783 and DVS13503-13505) was waived on the basis that the communication involved more than just a single client and attorney.[73]

## II.   Was the Privilege Waived by Production During Discovery?

As to the documents the court has determined were initially protected by the attorney-client privilege or the work-product doctrine, the court now goes on to address plaintiffs' argument that the protection was waived when defendants produced them in response to discovery requests.  The court concludes paragraph 18 of the Agreed Protective Order precludes this argument.

In response to plaintiffs' discovery requests, defendants produced more than 3,000 documents (totaling more than 16,000 pages).  The parties agree the six documents that are the subject of this motion were included in defendants' production.  They also agree the

---

[73] In advocating for application of the common-interest doctrine, defendants sometimes referred to it as the "joint defense/common interest doctrine."  To the extent the joint-defense doctrine presents a separate exception to waiver, the court need not address it here.

O:\ORDERS\21-2020-JAR-85.docx

documents were produced pursuant to the terms of the Agreed Protective Order, which they signed and submitted to the court, and which the court entered on April 21, 2021.[74] The Agreed Protective Order includes a provision in paragraph 18 to govern the "disclosure of confidential information covered by attorney-client privilege or work product."[75]  This so-called "clawback" provision reads, in relevant part:

> *Whether inadvertent or otherwise*, the disclosure or production of any information or document that is subject to an objection on the basis of attorney-client privilege or work-product protection, including, but not limited to, information or documents that may be considered Confidential Information under the Protective Order, *will not be deemed to waive* a party's claim to its privileged or protected nature *or estop that party or the privilege holder* from designating the information or document as attorney-client privileged or subject to the work-product doctrine at a later date. . . . [T]he provisions of this section constitute an order pursuant to 502(d) and (e) of the Federal Rules of Evidence, and will be construed in a manner consistent with the maximum protection provided by said rule. . . .[76]

Despite this clear language in the Agreed Protective Order directly pertaining to the facts underlying the instant dispute, plaintiffs argue defendants waived privilege either intentionally or inadvertently.

A.     Waiver by Intentional Disclosure

First, plaintiffs assert defendants waived any protection because defendants' production was intentional and followed a privilege review.  It's significant to note that

---

[74] *See* ECF No. 28.

[75] *Id.* at ¶ 18.

[76] *Id.* (emphasis added).

this asserted waiver arose from an e-mail exchange between counsel over a *different* set of documents.  On October 27, 2021, defense counsel e-mailed plaintiffs' counsel to note that plaintiffs' production included four e-mails that appeared to be privileged communications between Akers and her counsel.[77]  Plaintiffs' counsel responded that defendants were the ones who first produced the four e-mails to plaintiffs, along with other e-mails between Akers and her counsel, and thus any privilege attached to the four e-mails had been waived.[78]  This led defense counsel to more broadly represent that he had "carefully reviewed each and every email, mindful of the privilege standards . . . and chose to produce communications with Polsinelli that dealt with scheduling matters and business advice."[79]  The next morning, defense counsel again e-mailed plaintiffs' counsel, this time copying the attorney for the Akers Signatories, to state that when he conducted his pre-production review, he "segregated all the Polsinelli emails [and] spent 26.7 hours conducting an email-by-email privilege review of those emails" before producing those not privileged.[80]

Plaintiffs argue that defense counsel's assurance that he had performed a careful privilege review of all documents involving Polsinelli, which necessarily would include the e-mails at issue here, intentionally waived any protection that originally covered the documents when he produced them.  The court disagrees.  The plain language of the Agreed

---

[77] ECF No. 86 at 12.

[78] *Id.* at 11.

[79] *Id.*

[80] *Id.* at 13.

Protective Order clearly states that disclosure of protected information "will not be deemed to waive a party's claim to its privileged or protected nature or estop that party or the privilege holder from designating the information or document as attorney-client privileged or subject to the work-product doctrine at a later date."[81] This language covers the situation before the court. It permitted defendants to designate the documents at issue as protected, even after they were produced.

The court can imagine at least one situation in which a party could intentionally waive privilege/protection over *specific* documents produced under this sort of "Rule 502" protective order, by stating to the opposing party that *specific* documents were not privileged or protected, e.g., an opinion letter produced to support an advice-of-counsel defense. But that clearly is not the situation here. Rather, in discussing four other e-mails not at-issue, defense counsel asserted he reviewed "dozens" of potentially privileged e-mails over the course of 26.7 hours and produced the ones he deemed not privileged. The court does not construe this assertion as intentionally disclaiming and foregoing future designation of privilege over *all* of the "dozens" of attorney-client e-mails produced. Given the scope of the document production in this case, it comes as no great surprise to the court that even an extensive privilege review by counsel could result in inadvertently failing to assert privilege. Plaintiffs, understandably so, didn't call to defendants' attention the specific documents at issue here before seeking to use them at Lindsey's deposition.

---

[81] ECF No. 28 at ¶ 18.

But the fact remains that plaintiffs have presented no caselaw that would support their argument that an intentional waiver has occurred under these circumstances.  As stated by its plain language, the court must construe paragraph 18 of the Agreed Protective Order "in a manner consistent with the maximum protection provided by" Rule 502.  Under this standard, the court will not deem defendants' disclosure of privileged/protected information to have intentionally waived privilege.

### B.   Waiver by Inadvertent Disclosure

Plaintiffs next argue that, even if inadvertent, the disclosure waived the attorney-client privilege and work-product protection under the five-factor waiver test developed at common law.[82]  The obvious problem with this argument is it flies in the face of the very purpose of paragraph 18 of the Agreed Protective Order.  Paragraph 18 comes from the court's pre-approved form protective order and aligns with Fed. R. Civ. P. 26(b)(5)(B) and (f)(3)(D).  Like many other federal courts in recent years, the District of Kansas decided to include this language it in its form, pre-approved protective order for a sound reason, i.e., to avoid this kind of inevitably expensive and ultimately unproductive satellite litigation in which a party invites the court to wade—involving such murky, fact-intensive questions about the reasonableness of precautions taken to prevent disclosure and the fairness of

---

[82] Plaintiffs assert, for example, that waiting to assert privilege until the Lindsey deposition constituted an undue delay under the test.  ECF No. 100 at 10.  For a discussion of the five-factor test, see *Lloyds of London Syndicate 2003 v. Fireman's Fund Ins. Co. of Ohio*, 320 F.R.D. 557, 563 (D. Kan. 2017).

ordering production.[83]   Plaintiffs agreed to the protections of paragraph 18 when their counsel signed the Agreed Protective Order, and plaintiffs have given the court no reason not to hold them to their agreement.   Accordingly, given the inclusion of paragraph 18, the court finds the common-law waiver test for inadvertent disclosure inapplicable here.[84] Under paragraph 18, defendants are entitled to claw back the protected documents at issue.[85]

IT IS THEREFORE ORDERED that plaintiffs' motion to compel is granted in part and denied in part.   Plaintiffs' motion is granted as to the e-mail in DVS1671-1678 and as to the e-mails time stamped 8:29 a.m. and 11:39 a.m. in DVS13503-13505.   Mindful that the second amended scheduling order requires the parties' rebuttal experts to be disclosed

---

[83] *See, e.g., Rajala v. McGuire Woods, LLP,* No.08-2638-CM, 2013 WL 50200, at *5 (D. Kan. Jan. 3, 2013) (noting clawback provision of protective order "was entered with the express goal of eliminating disputes regarding inadvertent disclosure of privileged documents, which would disrupt the discovery process and cause the attorneys in this case to expend significant resources and time arguing about what steps were taken to prevent disclosure and to rectify the error"); *In re Testosterone Replacement Therapy Prod. Liab. Litig*., 301 F. Supp. 3d 917, 926 (N.D. Ill. 2018) (noting Fed. R. Evid. 502(d) allows parties to "create their own guidelines to address inadvertent disclosure and to avoid waiver-related litigation under Rule 502(b)").

[84] *See In re Testosterone Replacement Therapy,* 301 F. Supp. 3d at 926 (where parties entered a protective order with a Rule 502(d) clawback provision, the protective order, not Fed. R. Evid. 502(b) and caselaw governing inadvertent disclosure, applied).

[85] Based on the court's conclusion that defendants did not waive privilege or protection by their discovery production, the court need not go on to address whether it was even defendants' privilege/protection to waive (i.e., whether defendants even could have waived a privilege that belonged to the Akers Signatories as the clients seeking or receiving legal advice).

by February 11, 2022,[86] defendants are ordered to re-produce those documents by

**February 4, 2022**.  Plaintiffs' motion is denied in all other respects.

      Dated January 26, 2022, at Kansas City, Kansas.

                                         s/ James P. O'Hara
                                        James P. O'Hara
                                        U.S. Magistrate Judge

---

[86] ECF No. 59 at 2.