THE UNITED STATES DISTRICT COURT
DISTRICT OF KANSAS

| | |
|---|---|
| TP ST ACQUISITION, LLC, a Delaware limited liability company, and TP ST HOLDCO, LLC, a Delaware limited liability company,<br><br>                Plaintiffs,<br><br>   v.<br><br>KEVIN LINDSEY, an individual, and the DVS GROUP, LLC, a Kansas limited liability company,<br><br>                Defendants. | Case No. 21-CV-02020-JAR-ADM |

**PRETRIAL ORDER**

On April 7, 2022, U.S. Magistrate Judge Angel D. Mitchell conducted a pretrial conference in this case. Plaintiffs TP ST Acquisition, LLC and TP ST Holdco, LLC (collectively, "ScanSTAT")[1] appeared through counsel Anthony F. Rupp and Sarah E. Stula of Foulston Siefkin LLP, and Steve I. Silverman of Kluger, Kaplan, Silverman, Katzen & Levine, P.L. Defendants Kevin Lindsey ("Lindsey") and DVS Group, LLC ("DVS") (collectively, "Defendants") appeared through counsel Matthew T. Geiger of Geiger Prell, LLC.

This pretrial order supersedes all pleadings and controls the subsequent course of this case. It will not be modified except by consent of the parties and the court's approval, or by order of the court to prevent manifest injustice. FED. R. CIV. P. 16(d) & (e); D. KAN. RULE 16.2(b).

---

[1] These entities were specially created for the purpose of the acquisition described in the Membership Interest Purchase Agreement ("MIPA"). Plaintiffs allege both entities were material to the transaction and were harmed. Defendants do not anticipate raising any disputes regarding distinctions between these two entities. Thus, this pretrial order will refer to both entities collectively as ScanSTAT.

1

1)     **PRELIMINARY MATTERS.**

    a)     **Subject-Matter Jurisdiction.** Subject-matter jurisdiction is invoked under 28 U.S.C. § 1332(a)(1) and is not disputed.

    b)     **Personal Jurisdiction.** Personal jurisdiction is not disputed.

    c)     **Venue.** Venue is not disputed.

    d)     **Governing Law.** Subject to the court's determination of the law that applies to the case, the parties believe and agree that Kansas law governs the substantive issues in this case. However, Defendants assert that their secondary liability based on the primary liability of Janine Akers ("Akers") may be governed by Delaware law pursuant to the Delaware choice-of-law provision in the contract between ScanSTAT and Akers.[2]

2)     **STIPULATIONS.**

    a)     The following facts are stipulated:

        i.     Lindsey is the Founder and Managing Partner of DVS.

        ii.     At all times material, DataFile Technologies, LLC ("DataFile") was in the business of facilitating the exchange of medical patient information between healthcare providers and third-party requestors, and providing document management services for healthcare facilities located throughout the United States.

        iii.     Akers was DataFile's founder, majority owner, and Chief Executive Officer.

        iv.     Glenn Andrews ("Andrews") founded ScanSTAT, was the majority owner, and was chairman of its Board of Directors.

        v.     ScanSTAT is in the same business as DataFile—namely, facilitating the exchange of medical patient information between healthcare providers and third-party requestors, and providing document-management services for healthcare facilities located throughout the United States.

---

[2] For example, Defendants contend that the MIPA's definition of "material adverse effect" may bear on ScanSTAT's conspiracy claim.

- vi. On March 27, 2020, ScanSTAT entered into a transaction whereby it purchased all of the issued and outstanding membership interests of DataFile. Pursuant to the transaction, DataFile was to be combined with ScanSTAT's business.
- vii. Nelson Mullins Riley & Scarborough LLP represented ScanSTAT in the transaction.
- viii. Defendants, Polsinelli PC, and CBIZ advised DataFile and Akers in the transaction.
- ix. DVS received $660,000 for its work for Akers and Akers Holdco.
- x. At all times relevant to this case, Lindsey was acting as an agent or representative on behalf of DVS.

b)   The parties have stipulated to the authenticity of all documents exchanged between them and those produced by Akers pursuant to the subpoena served on her.

## 3) FACTUAL CONTENTIONS

a)   **Plaintiffs' Contentions.**

Akers owned and controlled DataFile through her ownership of Akers Holdco, LLC ("Akers Holdco"). In 2019, Akers hired Lindsey and DVS to help her sell DataFile. Lindsey owns another company that owns the majority of DVS, and DVS holds itself out to the public as an investment-banking firm. Lindsey was highly motivated to sell DataFile. Lindsey and his wife are close personal friends of Akers and her husband for over 25 years. And Lindsey wanted to make sure his time working on a transaction for Akers and DataFile would be successful because Defendants would not get paid if they didn't close the deal. DVS and Akers agreed to use a fee structure they had used previously pursuant to which Akers would pay DVS a "success fee" if Lindsey closed a transaction, with DVS receiving 4% of the value of any transaction up to $6 million, 3% of any transaction between $6 and $7 million, and 2% of any transaction over $7 million. The higher the price, the more money Defendants would make.

The price ScanSTAT was willing to pay to acquire DataFile was based largely on DataFile's earnings from its customer contracts and customer payments. Lindsey sent ScanSTAT a July 2019 DataFile overview with information and calculations about DataFile's EBIDTA earnings (Earnings Before Interest, Depreciation, Taxes and Amortization). Lindsey did not review the July document for accuracy and claims he did not know whether the EBIDTA numbers "were reasonable or not reasonable." After receiving the July 2019 DataFile overview from Lindsey, a ScanSTAT representative named Andy Mason ("Mason") emailed Lindsey on August 28 with an initial proposal to buy DataFile. Lindsey forwarded Mason's email and proposal to Akers. The parties' discussions continued. On November 14, ScanSTAT sent Akers (in care of Lindsey) a Letter of Intent ("LOI") to purchase DataFile.

On December 5, Mason sent Lindsey another LOI that substantially increased the value of August proposal. On December 11, Akers signed the LOI. Both sides retained lawyers, accountants, and other professionals to help them evaluate the proposed deal. In the parties' discussions, the amount and quality of DataFile's customers, customer contracts, and the revenue from DataFile's customers was a recurring theme. These conversations centered around DataFile's earnings and EBITDA, which was the backbone of ScanSTAT's financial analysis about whether to purchase DataFile and how much to pay for it. DataFile and its representatives repeatedly told Lindsey and Akers that DataFile's customer contracts and customer revenue were important to ScanSTAT. Lindsey claims he had no idea why ScanSTAT asked for DataFile's customer information; that he and Akers were not obliged to provide ScanSTAT with truthful information about DataFile's customers; and that he does not know and never knew that DataFile's earnings and customer base were important to ScanSTAT.

InterMed was among DataFile's "Top 10" customers. On March 20, 2020, InterMed told DataFile to discontinue work until further notice. Akers told Lindsey, knowing the InterMed notification was material and important. She stated: "Here we go….this is $500,000.00 [per] year. FFFFFFFFF! This will trigger. Please advise how to proceed." Lindsey wrote back: "This [the communication from InterMed] needs to be disclosed." But then Lindsey backtracked shortly thereafter, telling Akers: "Changed my mind on this as a disclosure." Akers agreed and followed Lindsey's instructions to conceal this material information, never telling ScanSTAT about any change in InterMed's business with DataFile.

On March 27, 2020, Akers sold DataFile to ScanSTAT via a document called a Membership Interest Purchase Agreement ("MIPA").[3] That morning before closing, Lindsey, Akers, ScanSTAT, and others had a call to update the information that Akers previously provided to ScanSTAT about the status of DataFile's customers and to provide assurances to ScanSTAT that the information they had previously been told about DataFile's customers remained accurate and unchanged. Lindsey and Akers knew the information they previously provided to ScanSTAT about InterMed was false. Akers and Akers Holdco were also required to give ScanSTAT a list of their 20 largest customers. The list they provided had various falsehoods, including that InterMed was still an active customer in good standing. During the call, Akers was asked if any of the customer information she previously furnished was false or inaccurate or had changed. She said no. Lindsey heard Akers' response. Neither Lindsey nor Akers ever corrected that response or told ScanSTAT about the true status of InterMed, nor did Akers or Lindsey disclose all of the other impaired and cancelled DataFile customer contracts prior to the MIPA closing.[4]

---

[3] The total price of the transactions was $26,500,000. Akers and Akers Holdco received $7,810,599.52 cash at closing, plus other substantial consideration.

[4] Lindsey's computer microphone was not working during the call, but he never called or emailed any of ScanSTAT's or DataFile's representatives to tell them about InterMed.

Akers was required to make truthful, correct, and full disclosures and representations concerning DataFile's customer relationships.[5] If Lindsey or Akers had told ScanSTAT about the status of InterMed and its instructions to DataFile to stop work, ScanSTAT would have immediately set upon a course to renegotiate an accurate price to purchase DataFile or to not to go forward with the purchase at all. Further, ScanSTAT would have known about a serious problem with one of DataFile's major customers and would have inquired further about the status of DataFile's other customer relationships. But Lindsey and Akers agreed to stay silent, causing ScanSTAT to close on its purchase of DataFile at an inflated price.

When the MIPA closed, Akers knew of other cancellations and impairments to additional DataFile customers that she also concealed and failed to disclose to ScanSTAT prior to the closing. On March 25, 2020, two days before closing, Akers provided ScanSTAT with a spreadsheet of what she represented to be DataFile's customers "[c]urrent as of today" (the "Current Customer List"). After closing, ScanSTAT discovered that the Current Customer List contained at least 16 companies that were no longer DataFile customers, had threatened to cancel their contracts, or had materially altered or amended their relationships with DataFile. These 16 customers are: InterMed, Alaska Heart Institute, Whitney M. Young Jr Health Center, Women's Clinic of Johnson County, Cornerstone Family Practice PLC, Pediatric Surgical, Esse Health, Central Ohio Primary Care Physicians (Canyon Project), Raleigh Medical Group, Michigan Orthopedic Specialists, Western Sierra Medical Clinic, Colorado Mountain, United Community Health Center, BCG

---

[5] MIPA Sections 3.13 and 3.18, and Schedule 3.18 (among others) contained Seller's Representations and Warranties that the information they provided regarding DataFile's relationships with its customers was accurate at the time of the closing. Akers breached these sections by providing false information about DataFile's customers, and by failing to disclose correct information about several of DataFile's customers. Akers' alleged breach is the subject of a separate lawsuit between ScanSTAT and Akers in Delaware.

Medical Group, ARCare (e-filing business), and West Texas Medicine (collectively, the "DataFile Impaired Customers"). Additionally, Schedule 3.18 of the MIPA set out what Akers represented to be "a complete and accurate list of (a) the twenty (20) largest customers of the Company," and Section 3.18 of the MIPA represented that "[t]he Company's relationships with the customers and the suppliers required to be listed on Schedule 3.18 are good commercial working relationships and no such customer or supplier has cancelled, terminated or otherwise materially altered . . . or notified the Company or the Company Subsidiary of any intention to do any of the foregoing or otherwise threatened to cancel, terminate or alter . . . its relationship with the Company." However, four of the companies that Akers listed in Schedule 3.18—InterMed, Alaska Heart Institute, Central Ohio Primary Care Physicians (Canyon Project), and ARCare (e-filing business)—were DataFile Impaired Customers. This constitutes an additional misrepresentation that Akers made regarding the status of DataFile's customers.

Lindsey's instructions to Akers to conceal InterMed's instructions to stop work encouraged and emboldened Akers not to disclose to ScanSTAT the many other DataFile Impaired Customers that had instructed DataFile to stop or limit work for them. Lindsey's improper advice to conceal material customer information harmed ScanSTAT by inducing it to pay a falsely inflated sale price for DataFile, leading to DVS receiving an inflated commission once the sale of DataFile went through.

  b) **Defendants Lindsey and DVS's Contentions.**

Defendants were the broker and advisor for Akers, not ScanSTAT. Furthermore, the Polsinelli law firm provided legal advice to Akers. Defendants did not have any contract with, did not perform any services for, and did not receive any payment from ScanSTAT. ScanSTAT employed and relied upon its own attorneys, accountants, and advisors to negotiate and conduct

7

due diligence on its behalf.  Neither ScanSTAT nor Akers expected their legal counsel or advisors to verify or guaranty the accuracy of information before providing it to the other side.  Defendants did not warrant the accuracy of DataFile information.

ScanSTAT did not conduct all the due diligence it could have conducted, and it did not review information provided during due diligence.  The DataFile purchase price was based on a 2019 quality of earnings report by an independent accounting firm, so nothing that happened in 2020 influenced the purchase price.  DataFile's customer contracts do not guarantee any particular revenue amount, and all of DataFile's customer contracts were terminable at will or on 30-days' notice.

Defendants did not make any false representation to ScanSTAT, or any representation that caused ScanSTAT damages, or conceal any information they had a duty to disclose.  They did not advise, encourage, or embolden anyone to commit fraud or conceal information from ScanSTAT.  The entire case against Defendants rests on a single string of communications between Lindsey and Akers about Intermed.

On March 19, 2020 (eight days before closing), Akers spoke with Andrews about the impact of Covid-19 on DataFile's customers and the downturn in work.  Akers testified in her deposition as follows:

> I very specifically talked to Glenn (Andrews) about how we're going to account for Covid … how does this work in this deal? Where are we here?  What does the bank think?  If we're not going to close on this, then let's stop wasting money … And he very enthusiastically emphatically said to me he makes the decision and that the money is already secured and the deal is closing.  Covid is a temporary blip.  Three weeks to flatten the curve, you know.

Andrews did not deny this conversation occurred and did not recall whether Akers told him Covid-19 was causing customer losses prior to closing.

The next day, on March 20, Intermed sent the following email to DataFile:

> COVID-19 is affecting us all very dramatically, and because of this, the volume of work we are seeing as a company has drastically decreased. Effective Monday, March 23, 2020, we are asking you to temporarily discontinue your e-filing work as well as the ROI work until further notice. At this time we are prioritizing our own employees and need to ensure we have enough work for them during these uncertain times.

Akers forwarded the Intermed email to Lindsey with the following message:

> Here we go … this is $500,000 year. FFFFFFFFFF! This will trigger. Please advise how to proceed?

Lindsey responded:

> This would obviously need to be disclosed, but it seems temporary until elective medical procedures come back online. We need to figure out if this deal is going to happen or not ASAP.

According to Lindsey, it was the $500,000 number that provoked his initial email reaction that the Intermed email needed to be disclosed. But Akers and Lindsey then had a telephone call in which Akers told Lindsey about her conversation with Andrews the day before. After Lindsey learned about that conversation, he emailed Akers that he "[c]hanged my mind on this as a disclosure."

Akers testified that, "Kevin's decision when he sent this was based on what I told him about my conversation with Glenn Andrews, the man who makes the decision on whether this deal moves forward or not." Lindsey also testified that he changed his mind about the Intermed disclosure based on his conversation with Akers:

> When I discussed this with Janine, she said she'd been in conversations on a daily basis with ScanStat (the buyer) regarding what was going on related to the shuffling of customers and all the craziness related to Covid, and was specifically talking about customer changes on ScanStat and DataFile side, on a daily basis.

Lindsey further testified that Akers had "been in daily communications with ScanStat and – on customers, and in her communication with ScanStat they said that this did not matter to them and

9

just go ahead and close the deal, that the business would come back." According to ScanSTAT's deposition testimony, the Intermed emails are the only information that ScanSTAT testified Defendants should have disclosed but failed to disclose. ScanSTAT has not made any reasonable efforts to regain Intermed as a customer. Plaintiffs discovered the Intermed emails by conducting an illegal search of Akers's email account and reading, among other items, attorney-client privileged communications between Akers and the Polsinelli law firm.[6]

The definition of "material adverse effect" in the transaction documents between ScanSTAT and Akers excludes "Changes in conditions generally affecting the industries in which the entity conducts business, unless such changes affect the entity in a materially disproportionate manner compared to other companies in the company's industry." Covid-19 affected the industry in which ScanSTAT and DataFile conducted their business and affected the general economic, political, and financial market conditions for everyone.

On March 27, 2020, ScanSTAT purchased the equity ownership of DataFile from Akers for $7,810,599.52. Lindsey did not speak on the pre-closing conference call. ScanSTAT made the decision to close the transaction despite the onset of a global pandemic and negative feedback from DataFile customers to ScanSTAT the week before closing. ScanSTAT wanted to buy DataFile because Andrews "saw a terrific opportunity with their customer base." He described the DataFile transaction as "a perfect fit," "huge for us," and "the only one" he saw happening because there were no other companies of DataFile's size that could easily combine with ScanSTAT. As a result of the DataFile transaction, ScanSTAT increased in size and scale, added services, expanded cross-selling opportunities, increased revenue, and realized cost-saving synergies. Three ScanSTAT witnesses testified the DataFile transaction was and still is a good idea.

---

[6] This issue may be the subject of motions in limine.

ScanSTAT terminated Akers within 60 days of closing and to date has not paid $1.25 million owed to her. ScanSTAT also received a $2.9 million loan from the Paycheck Protection Program for DataFile within one month of closing, all of which the federal government has forgiven, and a $3.1 million settlement under a representations and warranties insurance policy. Therefore, ScanSTAT has received at least $7.25 million to date that defendants are entitled to setoff. ScanSTAT's damage claim is further defective because it includes customer losses other than Intermed, even though defendants did not prepare or see the Current Customer List before closing, the Current Customer List revealed customer attrition, and ScanSTAT did not read the Current Customer List before closing.

**4)   LEGAL CLAIMS AND DEFENSES.**

   a)   **Plaintiff ScanSTAT's Legal Claims.**

ScanSTAT asserts it is entitled to recover upon the following theories:[7]

   i.   **Fraudulent Inducement (Count 1) – Against Both Defendants**

   Defendants, together with Akers and Akers Holdco, intentionally concealed and failed to make material disclosures to ScanSTAT about facts that ScanSTAT did not have and could not have discovered by the exercise of reasonable diligence regarding InterMed's termination of services with DataFile—namely, that InterMed was no longer a DataFile customer as of March 2020 and at the time of the MIPA closing. Defendants were obliged to disclose to ScanSTAT (and, as Akers' broker and investment banker, to advise Akers to disclose to ScanSTAT) accurate information about DataFile's customers and to correct any material misrepresentations that they knew to be false. Defendants induced ScanSTAT to close on the terms stated in the MIPA, which led to Defendants receiving a greater commission based on the inflated value of the transaction than if InterMed had been excluded from the MIPA as it should have been. ScanSTAT suffered substantial damages by proceeding to close when it otherwise would not have or closing at an artificially inflated price. Also, if Lindsey had disclosed the truth regarding InterMed to ScanSTAT, that would have put ScanSTAT on notice to make further inquiry of Akers and ScanSTAT would reasonably have discovered Akers' broader fraud relating to additional DataFile customers that had terminated or altered their status.

---

[7] The court dismissed ScanSTAT's claim for tortious interference with contract (Count 3) (ECF 36).

ii. **Negligent Misrepresentation (Count 2)** – Against Both Defendants

The facts supporting ScanSTAT's negligent misrepresentation claim are substantially the same as those supporting Count I, and those facts are incorporated herein. Briefly summarized, Defendants failed to exercise reasonable care or competence to communicate to ScanSTAT true and accurate information regarding InterMed's termination of services with DataFile, thereby inducing ScanSTAT to enter into the MIPA on artificially inflated terms.

iii. **Tortious Interference with an Existing or Prospective Business Relationship (Count 4)** – Against Both Defendants

A prospective business relationship existed between ScanSTAT and Akers and Akers Holdco, which Defendants interfered with in order to push the MIPA to close at an artificially inflated price so as to maximize Defendants' compensation.

iv. **Aiding and Abetting Fraudulent Inducement (Count 5)** – Against Both Defendants

Defendants aided and abetted Akers and Akers Holdco's fraudulent conduct by advising them not to disclose to ScanSTAT that InterMed had directed DataFile to stop work on its contract, and by failing to correct material misrepresentations made by Akers on the pre-closing conference call that no DataFile customer information had changed.

v. **Conspiracy (Count 6)** – Against Both Defendants

Defendants, Akers, and Akers Holdco conspired and agreed to intentionally conceal and materially misrepresent DataFile customer information from ScanSTAT in order to ensure that the MIPA closed and that it closed at an artificially inflated price, thereby damaging ScanSTAT by causing it to pay an artificially inflated amount to Akers and Akers Holdco, which in turn provided increased compensation to Defendants based on the artificially increased value of the transaction.

vi. **Unjust Enrichment (Count 7)** – Against Defendant DVS Only

Defendants' misrepresentations and omissions caused Akers and Akers Holdco to receive substantially overvalued consideration for the MIPA closing, which in turn artificially inflated DVS's commission—all of which was detrimental to ScanSTAT. Allowing DVS to retain this commission would be inequitable given the misrepresentations, omissions, and intentional torts committed by Defendants, Akers, and Akers Holdco.

b) **Defendants' Defenses.**

Defendants assert the following defenses:

### Failure of ScanSTAT's Burden of Proof

i. As to Counts 1, 2, 4, 5, 6 and 7, Defendants did not directly or indirectly make any knowing, reckless, or negligent false representation to ScanSTAT because Defendants made no statement alleged to be false and were not the source of any information alleged to be false.

ii. As to Counts 1, 2, 4, 5, 6 and 7, Defendants did not know or fail to disclose any material fact that ScanSTAT did not have and could not have discovered by the exercise of reasonable diligence because ScanSTAT knew DataFile was losing customers due to Covid-19, and Defendants had no duty to speak about Intermed.

iii. As to Counts 1, 2, 4, 5, 6 and 7, Defendants did not owe any duty or obligation to ScanSTAT because Defendants represented Akers, Defendants had no contractual or fiduciary relationship with ScanSTAT, and Defendants made no representation to ScanSTAT that later required correction.

iv. As to Counts 1, 2, 4, 5, 6 and 7, ScanSTAT did not have the right to rely on Defendants, or in the alternative, their reliance was not reasonable or justifiable because ScanSTAT was not relying on Defendants for any information about DataFile customers.

v. As to Counts 1, 2, 4, 5, 6 and 7, Defendants did not make any representation or statement, or fail to disclose any information, that caused ScanSTAT damages because the DataFile purchase price was based on a 2019 quality of earnings report prepared by a third-party engaged by ScanSTAT.

vi. As to Count 4, Defendants did not tortiously interfere because ScanSTAT realized its expectancy by closing the transaction, Defendants did not act with malice or engage in intentional misconduct, and the closing did not cause damage to ScanSTAT.

vii. As to Count 5, Defendants did not knowingly and substantially aid, abet, assist, encourage or embolden anyone to commit any fraud, wrongful act, or illegal or tortious activity that caused injury to ScanSTAT because Defendants gave Akers a good-faith opinion about Intermed based on the facts and circumstances known to Defendants.

viii. As to Count 6, Defendants did not conspire with anyone or agree to any tortious or illegal object or course of action, and did not commit any independent tort or overt act in furtherance of any conspiracy because Defendants gave Akers a good-faith opinion about Intermed based on the facts and circumstances known to Defendants.

ix. As to Count 7, DVS did not receive any benefit directly or indirectly from ScanSTAT, and DVS did not receive its commission from Akers under circumstances that would make the commission inequitable to retain because Akers paid the commission based on a purchase price determined by DataFile's 2019 earnings .

## **Affirmative Defenses**

x. As to Counts 1, 2, 4, 5, 6 and 7, Plaintiffs assumed the risk of business losses by engaging their own attorneys and advisors, conducting their own due diligence, negotiating representations and warranties directly from the seller, buying insurance for those representations and warranties, and making the decision to close the transaction during a global pandemic after receiving negative feedback from DataFile customers.

xi. As to Counts 1, 2, 4, 5, 6 and 7, Plaintiffs are estopped from asserting their claims because Plaintiffs represented that they were relying on their own attorneys and advisors and not Defendants, who were engaged to advise the seller.  Defendants relied on this representation.  Defendants will be materially harmed if Plaintiffs are allowed to claim they relied on Defendants instead of their own attorneys and advisors in the transaction.

xii. As to Counts 1, 2, 4, 5, 6 and 7, ScanSTAT has failed to mitigate its damages by failing to promote its services to former customers of DataFile, including Intermed.

xiii. As to Counts 1, 2, 4, 5, 6 and 7, ScanSTAT waived any claim that it relied on Defendants by engaging its own attorneys and advisors, conducting its own due diligence, negotiating representations and warranties directly from the seller, buying insurance for those representations and warranties, and deciding to close the transaction during a global pandemic after receiving negative feedback from DataFile customers.

xiv. As to Counts 1, 2, 4, 5, 6 and 7, Defendants are entitled to a setoff of $2.9 million ScanSTAT received for DataFile from the Paycheck Protection Program, $3.1 million ScanSTAT received as settlement under a representations and warranties insurance policy, and, to date, $1.25 million owed to Akers but unpaid.  ScanSTAT paid $7,810,599.52 to Akers at closing.

xv. As to Count 7, ScanSTAT is barred from equitable relief under the doctrine of unclean hands based on its alleged reliance on Defendants, when ScanSTAT represented that they were relying on their own attorneys and advisors and not Defendants.  Defendants also were not unjustly enriched by Akers's payment of a commission to her own broker.

5) **DAMAGES AND NON-MONETARY RELIEF REQUESTED.**

ScanSTAT seeks the following damages from Defendants:

a) As to Counts 1-2 and 4-6, ScanSTAT was damaged approximately $6.4 million as a result of Defendants' fraudulent concealment, negligent misrepresentation, conspiracy with Akers, and aiding and abetting Akers's fraudulent non-disclosure. This amount is based on ScanSTAT's overpayment for the purchase of DataFile EBITDA and lost expected profits related to the DataFile customer losses that were not disclosed to ScanSTAT.

b) As to Count 7, ScanSTAT seeks $128,280 from DVS, which is the amount DVS was unjustly enriched by including DataFile's impaired customers in the purchase price. If those customers were removed from the purchase price, the commission to DVS would have been $128,280 less than what was paid to it.

c) Plaintiffs also seek $1,826,300 in prejudgment interest for the overpayment damages stated in subparagraph (i) above, and $36,526 for DVS's unjust enrichment stated in subparagraph (ii) above. Prejudgment interest was calculated using the Kansas statutory rate of interest at 10%, simple between the transaction date of March 27, 2020, and an estimated judgment date of January 31, 2023. After January 31, 2023, prejudgment interest will accrue at $1,757 per day on the damages for ScanSTAT's overpayment, and at $35 per day for the damages relating to DVS's unjust enrichment.

d) Plaintiffs also seek to recover their costs of this action.

6) **AMENDMENTS TO PLEADINGS.**

None.

7) **DISCOVERY.**

Discovery is complete.

8) **MOTIONS.**

a) **Pending Motions.**

None.

b) **Additional Pretrial Motions.**

After the pretrial conference, the parties intend to file the following motions:

i. ScanSTAT will file a motion for summary judgment and motions in limine.

      ii.      Defendants will file a motion for summary judgment, motion to exclude expert opinions,[8] and motions in limine.

The dispositive motion deadline, as established in the scheduling order and any amendments, is **May 3, 2022**. The parties should follow the summary-judgment guidelines on the court's website:

      http://www.ksd.uscourts.gov/summary-judgment/

Consistent with the scheduling order filed earlier in this case, the arguments and authorities section of briefs or memoranda must not exceed 30 pages, absent an order of the court.

      c)      **Motions Regarding Expert Testimony.**

Motions to exclude testimony of expert witnesses pursuant to Fed. R. Evid. 702-705, *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), *Kumho Tire Co. v. Carmichael*, 526 U.S. 137 (1999), or similar case law, must be filed no later than **May 3, 2022**.

**9)**      **TRIAL.**

The trial docket, as established in the scheduling order and any amendments, is scheduled for **January 10, 2023**, in **Kansas City, Kansas at 9:30 a.m.** This case will be tried by jury. Trial is expected to take approximately 5 days. The court will attempt to decide any timely filed dispositive motions approximately 60 days before trial. If no dispositive motions are timely filed, or if the case remains at issue after timely dispositive motions have been decided, then the trial judge will convene another pretrial conference to discuss, among other things, the setting of deadlines for filing final witness and exhibit disclosures, exchanging and marking trial exhibits, designating deposition testimony for presentation at trial, motions in limine, proposed instructions in jury trials, and proposed findings of fact and conclusions of law in bench trials.

---

[8] Defendants contend that ScanSTAT's damage computations are inadmissible because ScanSTAT's damage expert used a flawed methodology.

IT IS SO ORDERED.

Dated April 19, 2022, at Kansas City, Kansas.

                                              s/ Angel D. Mitchell
                                              Angel D. Mitchell
                                              U.S. Magistrate Judge